ACCEPTED
03-17-00712-CV
21562262
THIRD COURT OF APPEALS
AUSTIN, TEXAS
1/2/2018 4:33 PM
JEFFREY D. KYLE
CLERK

# CAUSE NO. 03-17-00712-CV

## (consolidated with 03-17-00711-CV)

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
1/2/2018 4:33:36 PM
JEFFREY D. KYLE
Clerk

IN THE
COURT OF APPEALS
for the
THIRD DISTRICT OF TEXAS
at
AUSTIN, TEXAS

---

CAUSE NO. 03-17-00712-CV

Southern Concepts, Inc., Volunteers of America Texas, Inc., Knob Oak, Inc., Silver Quail, Inc., Community Access, Inc., and Creative Community Care, Inc., Appellants

v.

Texas Department of Aging and Disability Services, Appellee.

---

Original Proceeding from the 353rd District Court
Final order signed by Darlene Byrne, Presiding in the 126th Judicial District

---

CAUSE NO. 03-17-00711-CV

CALAB, Inc., Mosaic Inc., Mosaic Martin Luther Home, Mosaic of Bethphage, The Center Serving People with Mental Retardation, Unified Care Group, Appellants

v.

Texas Department of Aging and Disability Services, Appellee.

---

Original Proceeding from the 261st District Court
Final order signed by Gisela D. Triana, Presiding in the 200th Judicial District

---

Appellants' Brief on the Merits

---

**ORAL ARGUMENT REQUESTED**

---

Counsel for Appellant
Joanalys B. Smith
State Bar No. 05719200
Gay L. Bonorden
State Bar No. 00785708
Smith & Associates
900 Ranch Road 620 South
Suite C101-159
Austin, TX 78734

# IDENTITY OF PARTIES AND COUNSEL

Pursuant to Texas Rule of Appellate Procedure 38.1(a), Appellant presents the following list of all parties and names and addresses of its counsel:

**Appellants SOUTHERN CONCEPTS, INC., VOLUNTEERS OF AMERICA TEXAS, INC., KNOB OAK, INC., SILVER QUAIL, INC., COMMUNITY ACCESS, INC., AND CREATIVE COMMUNITY CARE, INC., CALAB, INC., MOSAIC INC., MOSAIC MARTIN LUTHER HOME, MOSAIC OF BETHPHAGE, THE CENTER SERVING PEOPLE WITH MENTAL RETARDATION, UNIFIED CARE GROUP**

**Counsel**
Joanalys B. Smith
State Bar No. 05719200
Gay L. Bonorden
State Bar No. 00785708
Smith & Associates
900 Ranch Road 620 South, Suite C101-159
Austin, TX 78734
Telephone: (512) 261-9990
Facsimile: (512) 261-9971
E-mail: Joanalys@LawOfficesJBS.com

**Appellee TEXAS DEPARTMENT OF AGING AND DISABILITY SERVICES**
**Counsel**
Eugene A. Clayborn, Deputy Chief
State Bar No. 00785767
Andrew Lutostanski
State Bar No. 24072217
Assistant Attorneys General
Office of the Attorney General of Texas
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548

3

Eugene.clayborn@oag.texas.gov
Andrew.lutostanski@oag.texas.gov

4

## TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL..................................03

TABLE OF CONTENTS ...................................................... 05

TABLE OF AUTHORITIES................................................ 07

STATEMENT OF THE CASE............................................ 09

STATEMENT REGARDING ORAL ARGUMENTS ......................... 10

ISSUES PRESENTED ........................................................11

STATEMENT OF FACTS...................................................12

    A. THE TAC RULES DID NOT ALLOW APPELLEE TO COLLECT ADDITIONAL QAF TAXES AS UNDERPAYMENTS FROM APPELLANTS DURING THE RELEVANT TIME..................................................12

    B. IN 2009 THE FEDERAL CENTERS FOR MEDICARE AND MEDICAID SERVICES DETERMINED THAT APPELLEE VIOLATED FEDERAL LAW.....................................................................18

    C. AMENDMENT OF THE TAC (EFFECTIVE 2008) FINALLY ALLOWED FOR QAF UNDERPAYMENTS TO BE COLLECTED.......................................................20

    D. APPELLEE'S ACTIONS IN RESPONSE TO ITS VIOLATION OF FEDERAL LAW..............................23

SUMMARY OF THE ARGUMENT ............................................. 23

ARGUMENT....................................................................27

    A. AS A MATTER OF LAW, APPELLEE CANNOT RECOVER ADDITIONAL QAF TAXES AS UNDERPAYMENTS FOR THE RELEVANT TIME BECAUSE THE GOVERNING LAW DID NOT PROVIDE

FOR THEIR RECOVERY AND THE QAF TAX WAS PAID ACCORDING TO EXISTING LAW............................27

B. AS A MATTER OF LAW, FEDERAL AND TEXAS LAW PROHIBITS RETROACTIVE APPLICATION OF QAF TAXES............................41

PRAYER ............................46

APPENDIX............................46

CERTIFICATE OF COMPLIANCE............................48

CERTIFICATE OF SERVICE............................48

6

## TABLE OF AUTHORITIES

**Cases**

1. *Bowen v. Georgetown Univ. Hospital*, 488 U.S. 204 (1988); ........42

2. *In re General Elec. Co.*, 271 S.W.3d 681 (Tex. 2008)...................43

3. *Jaster v. Comet II Constr., Inc.*, 438 S.W.3d 556, 562 (Tex. 2014)..................................................................................37

4. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280......................42

5. *Stanford v. Butler,* 142 Tex. 692, 181 S.W.2d 269, 273 (1944)....33

6. *State Office of Risk Management v. Berdan*, 335 S.W.3d 421 (Tex. App. Corpus Christi 2011), reh'g overruled, (Mar. 9, 2011) and petition for review filed, (May 25, 2011)...........................................43

7. *Sw. Pharmacy Solutions, Inc. v. Tex. Health & Human Servs. Comm'n*, 408 S.W.3d 549, 557-558 (Tex.App.--Austin 2013, pet. denied)..................................................................................29

**Statutes**

42 CFR Sec. 433.68...........................................................45

SSA Sec. 1903(w)(1)(A)(ii)..................................................45

Tx Govt. Code Sec. 2001.174......................10, 24, 25, 26, 34, 36

Tx Health & Safety Code 252.202(b)........................................27, 43

**Rules**

1 TAC 352.1-352.9(2003)...............................................13, 14, 27

1 TAC 351.1-352.9(2008)...............................................20, 30, 44

1 TAC 352.3(c)(2003)......................................................15, 16, 30

1 TAC 352.5(1)............................................................................14

1 TAC 357.483(c).......................................................................44

**Other Authorities**

28 TexReg 9235.........................................................................13

32 TexReg 7789 at 7790...........................................27, 30, 41

33 TexReg 667...........................................................................20

Tex. Const. Art. 1, § 16...........................................................27, 42

## STATEMENT OF THE CASE

This case is Appellants' appeal from a judicial review in which the district court entered a final order signed July 21, 2017 in favor of Appellee, granting summary judgment for Appellee and affirming Final Agency Orders entered in the Appeals Division of the Administrative Law Court (ALC) of the Texas Health and Human Services Commission. The district court further denied Appellant's motion for summary judgment. The Final Agency Orders held that Appellee could recoup additional Quality Assurance Fee (QAF) taxes from each Appellant.

This case is also a consolidation with Appeal Cause No. 03-17-0711-CV, which is also an appeal from a judicial review in the district court. The identical issues are presented for each Appellant and Appellee, and this Court granted consolidation upon Appellants' motion for "purposes of briefing and consideration only."

9

## STATEMENT REGARDING ORAL ARGUMENTS

This case raises significant issues related to the appropriateness of Appellee's rights to recoup additional Quality Assurance Fee (QAF) taxes in light of the calculation rules in place at the time each QAF tax was imposed and collected. At issue is whether such recoupment is permissible now, when not due and owing under the law in place at the relevant time. Both lower courts have failed to apply clear, controlling Texas law and legal precedent under Texas Gov't Code Sec 2001.174, containing the Substantial Evidence Rule. In particular, the courts have allowed the Appellee the right to recoup additional QAF taxes by allowing Appellee to re-interpret the applicable 2003 law which was in effect during the relevant time at issue here.

The inclusion of oral arguments will significantly aid the decision of this Court.

## II. ISSUES PRESENTED

1. Whether the lower courts properly interpreted the law or committed error regarding the applicable law, particularly the law that defined the QAF tax and how it was to be calculated. More specifically, Appellee is not now authorized to re-interpret the law to collect additional QAF taxes based upon the 2003 law that was settled and in effect during the relevant time period. The Final Order should be reversed.

2. Whether the lower courts committed error by retroactively applying the law that came into effect after the relevant time period. More specifically, the lower courts committed error by retroactively applying law that came into effect in 2008, which was after the relevant time period for calculation of the additional QAF taxes at issue. The Final Order should be reversed.

11

## III. STATEMENT OF FACTS

### A. THE TAC RULES DID NOT ALLOW APPELLEE TO COLLECT ADDITIONAL QAF TAXES AS UNDERPAYMENTS FROM APPELLANTS DURING THE RELEVANT TIME

Appellants are providers which provide care to consumers pursuant to individual Provider Agreements (Agreements) between Appellants and Appellee. AR93.[1] Appellee pays each Appellant for its various services to consumers as authorized under the Agreements, less authorized taxes or other authorized deductions. Authorized taxes and other deductions are calculated by rule based upon data mandated in Appellee's published rules, regulations, policies and practices. Providers paid QAF taxes to Appellee in the manner and time dictated by Appellee according to its rules, regulations and policies in place at the time. AR25-27.

The fundamental dispute in this case arises because Appellee's current demand for additional QAF taxes is based upon its own re-interpretation of the 2003 Law that was in effect during the relevant time. At the time, Appellee defined the QAF tax to be calculated and assessed on a *cash* basis as 6% of the gross receipts

---

[1] All of the Appellants have virtually identical Adminstrative Records ("ARs"), and each AR *is individually* numbered. Thus, cites to the AR will be to the record for Appellant Southern Concepts, Inc. for simplicity.

12

_actually_ _received_ by Appellant from Appellee in a particular _month_, reconciled every _six_ _months_ to refund _overpayments_ of the tax by Appellants. At issue here is Appellee's current demand for additional QAF taxes calculated and assessed on an _accrual_ basis as 6% of revenue _accrued_ in a particular _month_, reconciled _years later_ to recoup _underpayments_ of the tax by Appellants.

It is undisputed that the rule in place at the relevant time based the QAF tax on a _cash_ basis and not an _accrual_ basis. AR25-27. It is further undisputed that Appellants paid all QAF taxes as calculated by Appellee during the relevant time. AR22, 44. It is Appellee's current re-interpretation of the law and resulting recalculation of past taxes due that is at issue here.

The applicable 2003 Rules, 1 TAC §§ 352.1-352.9 (effective October 24, 2003), governed the QAF tax and were in effect during September 1, 2004 to December 31, 2007 (the "Relevant Time"). _See_ 28 TexReg 9235. Throughout the proceedings in the lower courts, Appellee repeatedly bases its current claims to additional QAF taxes

on an accrual recalculation years after assessment, which was not the law until the 2008 Amendments.

During the Relevant Time, Appellee required providers to submit specific census data at the beginning of each month, which Appellee then used to calculate the QAF tax due by a provider every month. AR25-27, 44-45. The record is undisputed and uncontroverted that each Appellant faithfully followed this procedure and made payment. Appellee defined its QAF tax by this method of calculations on its own accord and required providers to act according to its published rules and policies. *Id.* 1 TAC 352.5(1), as amended in 2003, was in effect during the Relevant Time and required Appellants to "pay the amount of the [QAF] in accordance with the instructions of the commission or its designees not later than the 30th day after the last day of the month for which the fee is assessed . . . ."

Each month the QAF was paid on *cash* *actually* received. AR25-26. In the present case, it is undisputed that Appellants accurately made their monthly payments in accordance with

14

Appellee's instructions during the Relevant Time. AR22, 44. There is no evidence that any Appellant, whether a large provider or a small provider, whether a for-profit or charitable organization (as Appellants run the gamut of such types of organizations) in any way submitted erroneous, inaccurate or incomplete data or acted in any manner that was dishonest or in any other way attempted to violate or manipulate any obligation it had to Appellee. The only evidence before this Court is that Appellants accurately and properly paid their QAF tax each month on a *cash* basis, and not on the accrual basis which became law with the 2008 Amendments. AR25-26.

Periodically during the Relevant Time, Appellee internally audited or "reconciled" its own QAF tax calculations. 1 TAC 352.3(c) (2003). The 2003 Rules required Appellee to perform these reconciliations for the QAF tax every *six* months. *Id.* In other program areas with periodic reviews or reconciliations and rules for reimbursement, Appellee regularly collected or "recouped" any underpaid amounts from the providers in accordance with rules which expressly granted such authority. It is undisputed that, during the Relevant Time (which lasted *three* years) and according to Appellee's

15

own practices for these three years and its internal policies and the 2003 Rules, if Appellee determined during its 6-month reconciliation that Appellee had calculated a provider's QAF tax as too low (*a.k.a.* "QAF underpayment"), Appellee *would not* attempt to collect or recoup the additional QAF tax difference from the provider. AR26. However, if the Appellee calculated a provider's QAF as too high (*a.k.a* "QAF overpayment"), the Rules dictated that Appellee would refund the difference between the reconciled QAF tax and the amount overpaid by a provider. AR36. The Rules mandated this reconciliation occur every *six* months. 1 TAC 352.3(c) (2003).

1 TAC 352.3(c) (2003) provided that "A facility's liability for the [QAF] may be adjusted following this review to ensure that the [QAF] *does not exceed* six percent of annual revenue.." There was no provision allowing for adjustment if QAF was less than six percent, and Appellee's practices were consistent with this interpretation of the Rule. Appellee continued this practice of not collecting QAF underpayments over the entire three-year Relevant Time period.

AR35 ("[Appellee] indicated that underpayments were never collected since the inception of the QAF program.").

Appellee based this deliberate policy regarding underpayments on several bases. First, the Rules governing QAF taxes in effect during the Relevant Time did not allow for collection of additional QAF taxes as being "underpayments". AR26, 32, 36. Indeed, the definition of the QAF tax in place during the Relevant Time as interpreted and practiced by Appellee did not include the factor of "underpayments," nor the collections of such additional taxes. Thus, the only evidence before the Court now is that Appellants paid their QAF tax as it was defined by law during the Relevant Time.

Appellee had no authority or procedures for the collection of QAF underpayments until the 2008 Rule amendments, after the Relevant Time, when the Rules relating to the definition of gross receipts, reconciliation, and enforcement were amended. AR25-26, 32.

Furthermore, "[Appellee] felt that the previous TAC language [in effect during the Relevant Time] was too vague in order to enforce

the repayment of underpayments to [Appellee] and therefore underpayments were not collected." AR32. "Again, [Appellee] did not enforce the collection of these underpayments because they felt that the TAC language was too vague and unenforceable." AR36.

## B. IN 2009 THE FEDERAL CENTERS FOR MEDICARE AND MEDICAID SERVICES DETERMINED THAT APPELLEE VIOLATED FEDERAL LAW

Appellee is also under contract with The Centers for Medicare and Medicaid Services (CMS) which provides the federal funding for the provision of services to consumers. CMS periodically performed "compliance reviews" to ensure Appellee was complying with federal law. One such review resulted in a Final Report dated August 31, 2009, which found that during the Relevant Time, Appellee had deficiencies in its process for determining QAF taxes. Appellee and stated that before 2008, Appellee "was not performing a proper reconciliation process." AR28, 35.

Additionally, Appellee "violated" Section 1903(w) of the Social Security Act which "requires that . . . taxes must: . . . be uniform, such that all providers within a class must be taxed at the same rate; . . . .

18

." AR21. Therefore, because Appellee's QAF taxes were not applied uniformly to providers, CMS stated that the entire QAF tax could be rendered impermissible. AR39. Consequently, if the QAF tax was rendered impermissible, Appellee would lose the matching federal Medicaid funds provided by CMS under federal law, indisputably an enormous sum.

CMS reasoned that Appellee's actions caused providers to be non-uniformly taxed because of Appellee's practice of refunding QAF taxes to providers if they overpaid the QAF tax but not collecting any underpayments of QAF taxes. AR21. This caused providers to pay different QAF tax rates. ." AR21, 36 (Providers underpayments "would appear to directly violate the uniformity requirement where all providers within a class must be taxed at the same rate").

Again, it was Appellee's sole, deliberate decision through its practices and its interpretation of the duly-promulgated Rules to calculate QAF on a _cash_ basis without factoring in underpayments, which resulted in non-uniform taxation. AR21. Appellee explained its actions in the Final Report: "The [Appellee] QAF program staff

19

indicated that they realize the cost reports are unreliable . . . . ."

AR37. And as noted above, Appellee deliberately chose its actions (which resulted in non-uniform taxation) because it believed the Rules in effect were just too vague to enforce any payments of additional QAF taxes as underpayments. AR32, 36; *see* AR40 (the 2008 amendment of the TAC was "intended to correct the previous non-uniform reconciliation process . . . .").

## C. AMENDMENT OF THE TAC (EFFECTIVE 2008) FINALLY ALLOWED FOR QAF UNDERPAYMENTS TO BE COLLECTED

To remedy Appellee's situation, several suggestions made in the CMS Final Report were put into place. First, the TAC was amended effective January 1, 2008, *which was after* the Relevant Time at issue here. *See* 1 TAC §§352.1-352.9, 33 TexReg 667. The amendments show as a matter of law, that the TAC during the Relevant Time did not provide for the collection of additional QAF taxes as underpayments, nor was it even used as a factor in defining and calculating the QAF tax due.

First regarding the 2008 amendments, Appellee admitted that under the "Previous Rules", "Providers were not charged for QAF

20

underpayments when the QAF reconciliations were completed." AR27. Thus, there needed to be "significant changes to the previous rules governing QAF . . . ." AR25. A significant change found in the new Rules was that "Providers . . . that underpay QAF will be required to pay the outstanding amount . . . ." AR26. This shows that prior to these amendments, the QAF tax was not defined or calculated using the factor of underpayments.

Second regarding the 2008 amendments, "Enforcement [of collection of QAF underpayments] was finally granted as of January 1, 2008 with the new TAC language." AR36. Thus, it was not until the 2008 amendments that "underpayments" became a factor in Appellee's calculation of the QAF tax--and consequently under the 2003 Rules, the proper, lawful QAF tax did not include the factor of "underpayments". The proper, lawful QAF tax was that calculated by Appellee monthly on a cash basis with any adjustments made under the six-month reconciliation rule.

Third, CMS noted that the amendment of the TAC was "intended to correct the previous non-uniform reconciliation process .

21

. . ." AR40. Thus, it was plain that the previous reconciliation process resulted in non-uniform taxation as admitted by Appellee.

Fourth, the amendment "clearly identifies that the calculating of QAF will no longer be performed on a *cash* basis . . . and that underpayments will now be enforced and paid to [Appellee]." AR36 (emphasis added). Appellee was not collecting underpayments *by its own deliberate policy choice* during the Relevant Time because it interpreted the Rules as not authorizing such collection before the new 2008 rules went into effect.

Fifth, the 2008 rules were considered "new". AR40. Any resultant requirement, like collection of additional QAF taxes as underpayments, was also new and not in effect during the Relevant Time.

Contrary to statements in the Final Order, CMS never "mandated" or "ordered" Appellee to collect QAF tax underpayments in the Final Report for the Relevant Time. CMS merely "requested" that it collect the additional QAF taxes as underpayments and stressed that "providers will be afforded the opportunity to appeal".

22

AR21, 31,40. CMS further noted the tentivative status of Appellee's response to the Report by stating "if you proceed". The nod to the appeal process shows foreknowledge that Appellee's attempts to collect underpayments could be improper under Texas law and that providers should be given an opportunity to respond to such collection efforts in the courts.

## D. APPELLEE'S ACTIONS IN RESPONSE TO ITS VIOLATION OF FEDERAL LAW

Despite the Rules and its own policies and interpretations in effect during the Relevant Time, in the face of the possibility of losing significant federal funds, Appellee demanded by letters to Appellants that they pay additional QAF taxes as underpayments. AR21-23. In the same letters, Appellee "acknowledges that [Appellants] followed the practices of [Appellee] in its payment of the QAF." AR22.

In response to these letters, Appellants requested individual informal reviews of the demand for QAF underpayments but the Appellee upheld its position. AR21. Appellants then appealed these determinations, which appeals landed in the ALC which upheld the collection of additional taxes as QAF underpayments. AR343.

## IV. SUMMARY OF THE ARGUMENT

23

**A.** The ALC committed error regarding the applicable law. Appellee is not authorized to now re-interpret the 2003 law to collect additional QAF taxes based upon the law that was settled and in effect during the Relevant Time period. Several statements in the Final Agency Order show that the ALC applied the wrong law--mixing up the language and proper interpretation of the 2003 and 2008 Rules. Appellee did the same after 2008, and these actions collectively prejudiced substantial rights of the Appellants because the administrative findings, inferences, conclusions, and decisions are capricious, arbitrary, in violation of constitutional and statutory provisions, in excess of the agency's statutory authority, clear error of law, and arbitrary, capricious and characterized by abuse of discretion and clearly unwarranted exercise of discretion. Under Texas Gov't Code Sec 2001.174, the Final Order should be reversed, and the Court find Appellants owe no additional QAF taxes.

Further, as set forth in the facts above, Appellee correctly interpreted the 2003 Rules for over three years to calculate the QAF tax as exactly as compliantly paid by Appellants during the Relevant Time. At the time, Appellee defined the QAF tax to be calculated and

24

assessed on a *cash* basis as 6% of the gross receipts *actually received* by Appellant from Appellee in a particular *month,* reconciled every *six months* to refund *overpayments* of the tax by Appellants. Unlawful is Appellee's current demand for additional QAF taxes calculated and assessed on an *accrual* basis as 6% of revenue *accrued* in a particular *month,* reconciled *years later* to recoup *underpayments* of the tax by Appellants. The Final Agency Order violates Texas Gov't Code Sec 2001.174.

The interpretation and settled 2003 law did not allow for the use of "underpayments" to recalculate the QAF tax and did not give Appellee authority to collect additional QAF taxes that were re-calculated using any alleged "underpayments". AR22, 26, 32, 36. Additionally, the 2003 Rules based the QAF tax on cash receipts, not accrued receipts. Thus, there is no legal authority for Appellee to now make a claim to additional QAF taxes as sought herein and its interpretation is plainly erroneous. And, the Final Agency Order upholding such violates Texas Gov't Code Sec 2001.174.

25

Given Appellee's many admissions regarding the QAF tax calculations and its interpretations and its policies and rules during the Relevant Time, as a matter of law, Appellee cannot now recoup additional QAF taxes as underpayments from the Appellants for the Relevant Time. Its current interpretation is plainly erroneous and its actions have no reasonable basis in the record. Substantial rights of the Appellants have been prejudiced because the administrative findings, inferences, conclusions, and decisions collectively are capricious, arbitrary, in violation of constitutional and statutory provisions, in excess of the agency's statutory authority, clear error of law, and arbitrary, capricious and characterized by abuse of discretion and clearly unwarranted exercise of discretion. Under Texas Gov't Code Sec 2001.174, the Final Order should be reversed and the Court find Appellants owe no additional QAF taxes.

**B.** The ALC committed plain error by retroactively applying law that came into effect in 2008, which was after the Relevant Time period for calculation of the additional QAF taxes at issue.

26

The Texas Constitution expressly prohibits Appellee from applying rules to Appellants retroactively. Tex. Const. Art. 1, Sec. 16. Appellee determined that there would be no additional cost to providers who were required to comply with the proposed 2008 amendments. *See* 32 TexReg 7789, at 7790. Thus, they cannot now add additional taxes to the 2003 QAF tax calculations due to the 2008 Amendments. There is no Texas statute that grants Appellee the power to make retroactive adjustments to the QAF, or to demand additional tax underpayments retroactively, as Appellee attempts now. *See* TEX. HEALTH & SAFETY CODE § 252.202(b) (only "prospective" adjustments allowed).

## V.   ARGUMENT

**A.   AS A MATTER OF LAW, APPELLEE CANNOT RECOVER ADDITIONAL QAF TAXES AS UNDERPAYMENTS FOR THE RELEVANT TIME BECAUSE THE GOVERNING LAW DID NOT PROVIDE FOR THEIR RECOVERY AND THE QAF TAX WAS PAID ACCORDING TO EXISTING LAW**

As explained above, as a matter of law, the TAC rules in effect during the Relevant Time, 1 TAC §§ 352.1-352.9, (effective 2003), calculated the QAF tax, and that amount as calculated by Appellee was paid by Appellants at the time, and the law as interpreted by

27

Appellee made no provision to collect additional QAF taxes as underpayments. AR26, 32, 36. As illogical as that may sound, Appellee justified this practice as explained above and continued this practice unchanged for over three years during the Relevant Time. AR26. Appellee defined its QAF tax differently during the Relevant Time than under the 2008 Amendments and had no authority or procedures for the collection of additional QAF taxes as underpayments until the 2008 Amendments, when the rules relating to the definition of gross receipts, reconciliation, and enforcement were amended. AR25-27.

Further, the 2008 amendments and Appellee's comments during this process and in the CMS Final Report additionally prove that the 2003 Rules calculated the QAF tax under a different formula and did not allow recoupment of additional QAF taxes as underpayments. *Id.* These were Appellee's interpretations based upon the Law which governed it. This is explained in depth above in the Statement of Facts.

28

In Appellee's arguments in the lower courts, it cites the Third Court of Appeals for the proposition that an agency's interpretation of a statute is entitled to serious consideration as long as the construction is reasonable and does not conflict with the statute's language. *Sw. Pharmacy Solutions, Inc. v. Tex. Health & Human Servs. Comm'n*, 408 S.W.3d 549, 557-558 (Tex.App.--Austin 2013, pet. denied). The 2003 statute is completely neutral regarding whether the QAF would be collected on revenue measured by accrual or cash basis but Appellee chose to enact rules defining the QAF tax on a cash basis and consistently for years interpreted the 2003 Rules as not allowing for recoupment of additional QAF taxes as underpayments. AR26, 32, 35, 36, 41.

According to Appellee's interpretation and practices, the QAF tax had been properly collected under the rules in place until 2008 Amendments. Appellee described the Rules as vague and unenforceable when it came to QAF underpayments, and many statements in the CMS Final Report and history of the 2008 amendments, as explained above, show that the Appellee did not interpret the 2003 Rules as allowing for recoupment of additional

29

QAF taxes as underpayments. *Id.* Appellee may describe the issue now as it chooses, with any attendant problems, but the fact remains uncontroverted that Appellants paid the QAF tax assessed in full under the 2003 Rules, under the definition of the QAF tax in the 2003 Rules and interpreted by Appellee. There is no evidence that any Appellant in any way did anything devious or untoward in its payment of the QAF tax during the Relevant Time.

Additionally, it was the 2008 rules, 1 TAC 352.1-352.9, that provided (1) gross receipts were defined as accrued payments rather than cash received, (2) new reporting and reconciliation procedures were implemented, and (3) new enforcement procedures for audits and (4) note to providers relating to audit findings regarding underpayments. AR25-27, 334-8 (Proposed Rules, Nov. 2, 2007 32 TexReg 7789). See also AR34 (indicating the understanding of CMS that the 2008 rule changes would allow Appellee's reconciliations to address both overpayment and underpayment of the QAF).

Under the 2003 Rules, 1 TAC 352.3(c) provided only that "a facility's liability for the [QAF] may be adjusted following this review to

ensure that the [QAF] does not exceed six percent of annual revenue." Revenue was undisputedly defined as monthly cash received. During the Relevant Time, this was the definition of the QAF tax. As the tax was calculated on a monthly cash basis, there was no underpayment. Appellee had no authority under any Rule to collect additional taxes as a putative QAF underpayments, much less to define or calculate the QAF tax differently than the 2003 Rule provided.

Additionally, any failure to follow CMS rules or federal law is solely attributable to Appellee, and not the providers who indisputably complied with Appellee's rules in every respect. AR22. Appellee disclosed to CMS that it failed to perform a proper QAF reconciliation process during the period in question. AR35. This failure is the result of law which failed to provide for this but in no way was the result of any action taken by Appellants. Thus, it is patently unfair for Appellee to attempt to use improper means now to correct its own error, which actions were patently obvious throughout the 3-year Relevant Time.

31

Furthermore, the ALC Final Order erroneously states that the 2003 Rules "created an obligation on [Appellants] to pay a total of 6% of its gross receipts." AR346. This interpretation flies in the face of the plain reading of the statute, which allows for an adjustment not to "*exceed* six percent." There is no requirement anywhere in the 2003 Rules mandating a flat 6% tax. It merely could not exceed 6% (unlike the 2008 amendments which stated the adjustments should "equal" the requisite percentage).

Further, gross receipts were the basis for each and every payment properly made by Appellants under the 2003 Rule, defining it as monthly *cash* received, rather than the definition Appellee now uses, which is receipts on an *accrual* basis. AR25-26, 45. Appellee chose to define its tax as the monthly gross revenue actually paid to Appellants. Appellee sent Appellants a bill for this, and it is uncontroverted that each Appellant paid this amount properly. Appellee now contends that the amount it billed and collected under the definition of QAF tax in place under the 2003 Rules is less than

6% of gross revenue calculated on an *accrual* basis, a basis not in law until 2008.

In fact, the statute mandates only that the tax *not exceed* 6%, and the QAF tax defined and used in 2003 complies with this requirement. Thus, Appellee could permissibly impose under the statute a percentage less than 6%, if it so decided. Clearly, Appellee's actions during the Relevant Time bore this understanding out--it did not tax all providers at 6%, but taxed them at different rates--resulting in non-uniform taxation.

It is patently unfair for Appellee to have construed, interpreted and applied the law for over three years during the Relevant Time period one way, and then to re-interpret that law afterwards because it was called out on its deliberate and knowing practice of non-uniform taxation by CMS. It is still patently unfair to Appellants for Appellee to re-interpret the law even when Appellee, a state actor, is at risk of losing enormous sums of federal entitlements for its chosen course of action. *See Stanford v. Butler,* 142 Tex. 692, 181 S.W.2d 269, 273 (1944) (explaining that an agency's construction of a statute it is

charged with enforcing is "worthy of serious consideration as an aid to interpretation, particularly where such construction has been sanctioned by long acquiescence").

In light of this, the Final Order is unduly deferential to Appellee and made through error of law. As a matter of law, judgment is appropriate that Appellee is not allowed to collect additional taxes as underpayments for the Relevant Time because the QAF tax was collected in accordance with valid law in effect, and there exists no legal basis for the present requested recoupment. Appellee's current interpretation of the 2003 law is plainly erroneous and its actions have no reasonable bases in the record as set forth above.

1. **The Final Agency Order should be reversed under Texas Gov't Code Sec 2001.174, the Substantial Evidence Rule**

The ALC's decision should be reversed to the extent it violates the substantial evidence rule under the Texas Gov't Code Section 2001.174 which states:

Review Under Substantial Evidence Rule or Undefined Scope of Review

If the law authorizes review of a decision in a contested case under the substantial evidence rule or if the law does not define

the scope of judicial review, a court may not substitute its judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion but:

(1) may affirm the agency decision in whole or in part; and

(2) shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

    (A)   in violation of a constitutional or statutory provision;

    (B)   in excess of the agency's statutory authority;

    (C)  made through unlawful procedure;

    (D) affected by other error of law;

    (E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or

    (F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Further, the Appellee's reinterpretation of the 2003 Rules are unreasonable and plainly erroneous.

Appellee wrongly asserts that the ALC applied the proper law with a proper interpretation, the 2003 Rules, in the Final Order. Several statements in the Final Order show that the ALC applied the wrong law--mixing up the language and proper interpretation of the 2003 and 2008 Rules. Appellee did the same after 2008, and these

actions collectively prejudice substantial rights of Appellants and are capricious, arbitrary, in violation of constitutional and statutory provisions, in excess of the agency's statutory authority, clear error of law, and arbitrary, capricious and characterized by abuse of discretion and clearly unwarranted exercise of discretion. Under Texas Gov't Code Sec 2001.174, the Final Order should be reversed and judgment granted that Appellants owe no additional QAF taxes. Further, the Final Order is not reasonable and plainly erroneous.

First, the Final Order states that "the rules in effect during the period in question created an obligation on [an Appellant] to pay a total of 6% of its gross receipts." AR345-6. However, the Final Order does not address the issue of gross receipts calculated by cash basis (as was in effect in the Relevant Time) or the accrual basis which came into effect with the new 2008 Rules. The ALC completely disregards the different definitions of gross receipts in the 2003 and 2008 Rules. AR25-26, 32. Thus, the Final Order conclusion is plainly erroneous and contrary to the existing law and constitutes abuse of discretion and clearly unwarranted exercise of discretion.

36

Furthermore, the 2008 amendments show the Final Order's error. The 2003 Rules at 352.3(c) required reconciliation to ensure that the "[QAF] *does not exceed* six percent of annual revenue". (Emphasis added.) But, the 2008 Rules at Section 352.3 stated the QAF tax may be adjusted "to ensure that the [QAF] *equals* five and one half percent of annual gross receipts from all facilities."[2] (Emphasis added.) Clearly, the plain statutory construction, especially in light of the change to "equal" in 2008, shows that the 2003 Rules did not mandate a 6% flat fee. Any contrary conclusion is plainly erroneous and made by error of law.

Additionally, this change shows that in 2008, the statutory intent was that the QAF annual reconciliation ensure QAF taxes "equal" 5.5% while the 2003 reconciliation was to ensure the QAF "does not exceed" 6%--not that QAF should be adjusted to *equal* 6% for all providers. As stated by Appellee, the courts should read the statute contextually to give effect to every word, clause, and sentence. *Jaster v. Comet II Constr., Inc.*, 438 S.W.3d 556, 562 (Tex. 2014).

---

[2] The Rules changed the requisite percentage from 6% in the 2003 Rules to 5.5% in the 2008 Amendments, along with other changes.

37

Thus, the plain conclusion is that the 2003 Rules did not mandate a 6% flat rate on all providers based on gross receipts. Clearly, it was permissible for the 6% QAF tax to be based upon cash receipts, as Appellee did.

More confusion continues in the Final Order. The ALC Order stated that Appellee was entitled to collect underpayments "up to a total of six percent of said gross receipts . . . ." Granting "up to" six percent conflicts with the prior ALC statement that the statute "created an obligation on [a Appellant] to pay a total of 6% . . . ." The Final Order contradicts itself internally, ordering an entitlement that conflicts with its prior statement of the law. The Final Order is plainly erroneous, capricious and arbitrary. But, Appellee's interpretation of the 2003 Rules during the Relevant time is correct in light of its statements, policies, practices and legal interpretation during the Relevant Time.

Appellants do not dispute that the statutes allow Appellee to collect the QAF tax. Nor do Appellants dispute that each facility was to required to pay QAF taxes without any exception. Appellee did

38

collect all the QAF taxes that it asked of Appellants during the Relevant Time, and they each paid the QAF tax as calculated and instructed by Appellee. But, the statutes granting Appellee the authority to collect QAF taxes does not give them the authority to reinterpret the 2003 law years later and attempt to collect additional QAF taxes based upon the re-interpreted law in violation of substantial rights of Appellants. Such action is arbitrary and capricious, made through error of law, unreasonable and plainly erroneous.

Additionally, Appellant's agree that the 2003 Rules allowed for an adjustment of a provider's QAF amount during reconciliation. But, the adjustment was only allowed at the 6-month interval mandated by the Rule. The 6-month rule does not give Appellee the power to then re-adjust the QAF at another time according to Appellee's whims. The plain reading of the statute provides for one adjustment—at each 6 month interval. It does not allow for multiple adjustments, possibly years after a 6-month reconciliation period passed, as in the present case. Such actions are capricious and arbitrary. Under Appellee's current interpretation, it could again recalculate the QAF and demand

39

more tax from Appellants. Clearly, Appellee's actions are an abuse of discretion and a clearly unwarranted exercise of discretion and unlawful.

Appellants further agree that they were to pay the QAF according to the instruction of the commission. But, Appellants did that fully and completely. The evidence shows that Appellants followed all of Appellee's Rules when they paid their QAF taxes during the Relevant Time. AR22, 44. There is no evidence that any Appellant did anything otherwise. That Rule does not allow Appellee to change its instructions after Appellants have fully and completely complied with its instructions. Nor does this Rule give Appellee the power to change its instructions years after its prior instructions were fully complied with by Appellants. Such actions are capricious and arbitrary and an abuse of discretion and a clearly unwarranted exercise of discretion and violate substantial rights of Appellants to be free from unreasonable taxation, essentially civil ex post facto taxes.

Appellee's interpretation of the 2003 Rules during the Relevant Time were correct and consistent with the plain meaning of the rules

40

and statutes and should be applied to the present case. The Final Agency Orders should be reversed and judgment rendered that Appellants owe no additional QAF tax.

## B. AS A MATTER OF LAW, FEDERAL AND TEXAS LAW PROHIBITS RETROACTIVE APPLICATION OF QAF TAXES

The Texas Constitution expressly prohibits Appellee from applying rules to Appellants retroactively. Tex. Const. Art. 1, Sec. 16. Appellee is clearly attempting to collect the taxes retroactively because it continues to cite the 2008 Rules to support its position for additional taxes in its briefings in the lower courts.

In making its required Small Business and Micro-Business Impact Analysis of the 2008 Rules, Appellee determined that there would be no additional cost to providers who were required to comply with the proposed amendments. *See* 32 TexReg 7789, at 7790. Appellee also determined that the new 2008 Rules would not restrict or limit an owner's right to his or her property that would otherwise exist in the absence of government action. *Id.* It does not appear from the plain language of the 2008 Rules or the analyses made that there was any intention that the new rules have a retroactive effect at

41

The Legislature has expressly stated that QAF tax is subject to

The Legislature has expressly stated that QAF tax is subject to

the time of adoption or to change the status quo retroactively. Thus, Appellee's contrary actions to these determinations through its current unlawful collections are improper and untenable, and are unduly deferential to Appellee and made through error of law.

Appellee's informal review decision relies on the 2008 rule amendments as a justification for recouping the additional taxes as alleged QAF underpayments. AR21. However, under federal precedent and the Texas and United States Constitutions, Appellee is prohibited from retroactively applying rules where the legislature has not expressly conveyed that power to Appellee. *See generally Bowen v. Georgetown Univ. Hospital*, 488 U.S. 204 (1988); *see also Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (absent clear legislative intent, an agency may not give retroactive effect to statutes or rules that impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed); *See also* Tex. Const. Art. 1, § 16 (prohibits the enactment of retroactive laws).

The Legislature has expressly stated that QAF tax is subject to a "**prospective** adjustment as necessary." *See* TEX. HEALTH & SAFETY CODE § 252.202(b) (emphasis added). Conversely, there is no Texas statute that grants Appellee the power to make retroactive adjustments to the QAF, or to demand additional tax underpayments retroactively, as Appellee attempts now.

Courts must rely on the plain meaning of statutory text. *See State Office of Risk Management v. Berdan*, 335 S.W.3d 421 (Tex. App. Corpus Christi 2011), reh'g overruled, (Mar. 9, 2011) and petition for review filed, (May 25, 2011). Every word excluded from a statute must also be presumed to have been excluded for a purpose. *See In re General Elec. Co.*, 271 S.W.3d 681 (Tex. 2008). Appellee is violating the plain language of this legislative mandate regarding the QAF tax. Further, all courts are bound by the same legislative mandate, including the ALC.

Appellants are not asking that this Court find that any particular rule or statute is invalid. However, the Court does have the authority to issue "any order in the interest of justice that is necessary to

43

protect the person or party seeking relief from...invasion of ... constitutional rights" under 1 T.A.C. § 357.483(c). Appellants are simply hereby requesting that the Court apply the validly promulgated rules in effect at the Relevant Time, as U.S. Supreme Court precedent, our state law, and the federal constitution requires. Under the 2003 law in effect during the Relevant Time, Appellants paid the QAF tax due, and Appellee has no authority to collect additional QAF taxes as underpayments or otherwise.

Of significant note, CMS gave Appellee a choice about whether or not it would seek additional QAF taxes for the Relevant Time, albeit with a hefty consequence if chose not to seek them. CMS did not "direct" nor demand nor mandate that Appellee collect additional taxes as underpayments from providers, contrary to the statement in the Final Order. AR39. In response, Appellee, a state actor, did not promise to recoup the underpayments--it only agreed to "seek recoupment." AR40. Appellee added the caveat that collections "may not total" the amount of underpayments identified by CMS. AR40. Also, the Final Order only required Appellee to "collect all

44

underpayments of [Appellant's] QAF *up to* a total of 6% of said gross receipts." AR347 (emphasis added).

It is those underpayments that allegedly resulted in non-uniform taxation, and thus, Appellee admits that its collection efforts, that are the subject of this case, *may not even* result in uniform taxation. And, the ALC does not even require Appellee to collect an amount that results in uniform taxation. It is illogical that Appellee, a state actor, should be allowed to seek recoupments so that it can comply with "uniform taxation" when it admits that its actions in recouping may not result in "uniform taxation." These actions are arbitrary and capricious.

Further, the federal law cited by CMS in the Final Report regarding Appellee's QAF program specifically provides that the State, and not taxpayers (like Appellant providers), will be penalized for "hold harmless" violations in which taxpayers are held harmless for any portion of health-care related taxes. See 42 CFR Sec. 433.68 (setting forth federal requirements for state health care-related taxes). See also Social Security Act Section 1903(w)(1)(A)(ii) (providing that

hold harmless arrangements trigger penalties against a State's Medicaid expenditures under the Federal Medicaid Statute). AR34 (explanation in the CMS Final Report of the federal regulations regarding hold harmless arrangements and penalties).

Any liability for errors in the calculation of Appellants' QAF taxes is solely attributable to Appellee, and not Appellants. As a matter of law, Appellee has no legal basis for demanding retroactive QAF payments from Appellants, and Appellants are entitled to judgment that they owe no additional QAF taxes and reversal of the Final Order. Appellee's actions have no reasonable basis in the record and its interpretation of the Law is plainly erroneous.

## VI. PRAYER

Appellants hereby seek a judgment that the Final Agency Orders are reversed, that Appellants owe no additional QAF taxes for the Relevant Time, that Appellee be estopped from any further collection efforts, and such other and further relief to which Appellants may be entitled.

## VII. Appendix

1. Final Agency Order
2. District Court Final Judgment (appeal 712)

46

3. District Court Final Judgment (appeal 711)

4. 1 TAC §§ 352.1-352.9 (effective October 24, 2003)

5. 28 TexReg 9235

6. Texas Gov't Code Sec 2001.174

7. 1 TAC §§352.1-352.9 (effective Jan. 1, 2008)

8. 33 TexReg 667

9. 32 TexReg 7789-90

10. 1 T.A.C. § 357.483(c)

11. 42 CFR Sec. 433.68.

Respectfully submitted,

**SMITH & ASSOCIATES**

900 Ranch Road 620 South

Suite C101-159

Austin, Texas 78734

Telephone (512) 261-9990

Facsimile (512) 261-9971

Joanalys@LawOfficesJBS.com

Gay@LawOfficesJBS.com

By: __/s/ Joanalys B. Smith_

Joanalys B. Smith

Texas Bar Number 05719200

Gay L. Bonorden

Texas Bar Number 0785708

Attorneys For Appellants

## CERTIFICATE OF COMPLIANCE

I certify that the brief submitted complies with Texas Rules of Appellate Procedure 9 and the word count of this document is 7773. The word processing software used to prepare this filing and calculate the word count of the document was Google Docs.

Dated: December 29, 2017

/s/ Joanalys B. Smith
JOANALYS B. SMITH

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served by electronic service or facsimile on this the 29th day of December, 2017, to counsel for Appellee:

Eugene A. Clayborn                           Via e-service and/or email
Deputy Chief
State Bar No. 00785767
Andrew Lutostanski
State Bar No. 24072217
Assistant Attorneys General
Office of the Attorney General of Texas
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Eugene.clayborn@oag.texas.gov
Andrew.lutostanski@oag.texas.gov

/s/ Joanalys B. Smith
Joanalys B. Smith

48

# APPEALS DIVISION
## Health and Human Services Commission
### AUSTIN, TEXAS

SOUTHERN CONCEPTS, INC.,
Appellant

VS.                                     §          CAUSE NO. 10-0775-K

TEXAS DEPARTMENT OF AGING AND
DISABILITY SERVICES,
Respondent

## PROPOSAL FOR DECISION

### INTRODUCTION

Southern Concepts, Inc. (Appellant) had an Intermediate Care Facility for the Mentally Retarded (ICF/MR) provider agreement with the Department of Aging and Disability Services (DADS) during the times relevant to this appeal. Appellant appealed the results of an Informal Review of the calculation of Appellant's quality assurance fee (QAF) for the period of September 1, 2004, through December 31, 2007.

### JURISDICTION, NOTICE AND PROCEDURAL HISTORY

The HHSC Appeals Division heard this case under the authority of 40 Texas Administrative Code Sections 90.3 and 90.4. The Administrative Law Judge (ALJ) notified the parties that Appellant's Motion to Transfer this case to the State Office of Administrative Hearings (SOAH) was denied, and proceeded to consider the parties' Motions for Summary Disposition and motions in opposition thereto. The parties waived oral argument.

APPENDIX 1

000343

2

## APPLICABLE LAW

40 Texas Administrative Code Section 90.4 provides that the Health and Human Services Commission Appeals Division has jurisdiction to conduct hearings and issue Proposals for Decisions (PFDs) in contested cases that are not transferred to SOAH under the provisions of 40 Texas Administrative Code Section 90.3.

40 Texas Administrative Code Section 90.3 does not provide for the transfer of an appeal of DADS Informal Review of a Provider's QAF to SOAH.

1 Texas Administrative Code Section 352.3 in effect during the time period from September 1, 2004, through December 31, 2007, required ICF/MR providers to pay a QAF equal to 6% of the facility's total annual gross receipts in Texas.

40 Texas Administrative Code Section 11.5 provides that the QAF is to be paid in accordance with the instructions of the agency.

40 Texas Administrative Code Section 11.8 provides that an ICF/MR provider may request an Informal Review of DADS' calculation of its QAF.

40 Texas Administrative Code Section 11.9 provides that an ICF/MR provider may appeal the results of the Informal Review of the calculation of its QAF to the HHSC Appeals Division.

1 Texas Administrative Code Section 352.8 in effect during the year 2009 provided that a Medicaid provider could request an Informal Review of DADS' calculation of its QAF.

40 TAC Section 91 provides that the HHSC Appeals Division conducts contested cases in accordance with DADS and HHSC Contested Case Hearings Rules.

1 TAC Section 357.456 provides that an ALJ may issue a Summary Disposition in favor of a party if there is no genuine issue of material fact and the party is entitled to disposition in its favor as a matter of law.

## STATEMENT OF THE CASE

Appellant is a certified ICF/MR provider based in Granbury, Texas. Appellant contracted to provide services to qualified individuals with mental retardation or related conditions pursuant to its Medicaid provider agreement. On November 18, 2009, DADS notified Appellant that it determined that Appellant had underpaid its QAF, and that it would collect all underpayments of Appellant's QAF for the period from September 1, 2004, through December 31, 2007. On December 4, 2009, Appellant requested an Informal Review of DADS' determination of the amount Appellant underpaid for that time period based on DADS' calculation of 6% of Appellant's annual gross receipts. On September 29, 2010, DADS notified Appellant of the results of the Informal Review and that it determined that Appellant owed DADS $8,485.28 representing the amount of Appellant's QAF underpayments for the period from September 1,

2004, through December 31, 2007. Appellant filed a formal appeal of the outcome of the Informal Review on October 21, 2010.

## SUMMARY OF THE EVIDENCE

It was undisputed that the Health and Human Services Commission administered the ICF/MR QAF program for a time frame that included the period from September 1, 2004, through December 31, 2007. Sometime after responsibility for the administration of the program was transferred to DADS, the agency was notified by the Centers for Medicare and Medicaid Services (CMS) that HHSC had under-collected the federally mandated 6% QAF from Appellant and other ICF/MR providers during the period from September 1, 2004, through December 31, 2007. CMS mandated that DADS collect all funds that it determined were underpaid.

During the time period of September 1, 2007, through December 31, 2007, HHSC required Appellant and other ICF/MR providers to pay QAFs based on projected gross receipts. When actual revenues fell below projections, HHSC refunded the overpayments, but when actual revenues exceeded projections, HHSC did not require providers to make up the underpayments. In 2009, CMS notified DADS that DADS was required to collect all periodic QAF underpayments that had not been collected from ICF/MR providers, including Appellant, for the period in question,

DADS attached the affidavit of Cathy Belliveau, a QAF Manager employed by DADS, to its Motion for Summary Disposition. Ms. Belliveau's affidavit stated that during the period of September 1, 2004, through December 31, 2007, Appellant's annual gross receipts were $6,421,026.81 and that this calculation was based on official billing records maintained by DADS.

In response to DADS' summary disposition evidence, Appellant filed a copy of the November 18, 2009, DADS notice of intent to collect Appellant's QAF underpayments; a copy of an August 1, 2008, letter to Appellant from Tommy Ford, DADS Director of Institutional Services Section, Provider Services, in which Mr. Ford described the QAF rules in place prior to January 1, 2008, as not requiring charges for QAF underpayments by ICF/MR providers; and a copy of an August 31, 2009, report issued by CMS which included conclusions that data it previously obtained from DADS regarding QAF payment reconciliations contained confusing and conflicting information. Finally, Appellant submitted an affidavit from one of its representatives who swore that Appellant paid its QAF in the form of 6% of all projected revenues

## ANALYSIS

HHSC did not follow its own rules when it failed to collect Appellant's QAF underpayments during the time period of September 1, 2004, through December 31, 2007. DADS mischaracterized the QAF rules in effect during that time period in its August 1, 2008, letter to Appellant in which it indicated that the prior HHSC rules did not require HHSC to collect underpayments of the fee when the provider made QAF payments based on projected revenues

000345

that were lower than the actual gross receipts for the period in question. Nevertheless, the rules in effect during the period in question created an obligation on Appellant to pay a total of 6% of its gross receipts. This obligation was not obviated by HHSC's inability to devise a scheme to collect said receipts or DADS' erroneous portrayal of the rule that created the obligation in Mr. Ford's August 1, 2008, letter to Appellant.

Cathy Belliveau's affidavit which described Appellant's gross receipts for the period of September 1, 2004, through December 31, 2007, was not controverted by the CMS report which described inaccuracies in DADS' records during an unspecified time period prior to DADS' reconciliation of Appellant's gross revenues described in the November 18, 2009, notice of QAF charges due, or by the affidavit of Appellant's representative which included a statement that Appellant paid all of its QAF fees based on projected revenues.

Because Cathy Belliveau's uncontroverted affidavit established that Appellant's total gross receipts for the period of September 1, 2004, through December 31, 2007, were $6,421,026.81, and that 6% of that amount is $385,261.60, the ALJ has determined that there are no genuine issues of material fact in controversy, and proposes that DADS' Motion for Summary Disposition should be sustained, and that its authority to collect underpayments of Appellant's QAF fees based on that calculation should be sustained.

## PROPOSED FINDINGS OF FACT

1. This case is adjudicated under the provisions of 40 Texas Administrative Code Section 11.9, 90.3, and 90.4.

2. Appellant is an ICF/MR provider based in Granbury, Texas.

3. On November 18, 2009, DADS notified Appellant that it owed underpayments for Quality Assurance Fees (QAF) for the period from September 1, 2004, through December 31, 2007.

4. Between September 1, 2004, and December 31, 2007, Appellant had gross receipts of $6,421,026.81.

5. Appellant's total QAF for the period in questions is $385,261.60 which is 6% of $6,421,026.81.

## PROPOSED CONCLUSIONS OF LAW

1. 40 Texas Administrative Code Section 11.9 provides that an ICF/MR provider may appeal an informal review of DADS calculation of its QAF to the HHSC Appeals Division.

2. 40 Texas Administrative Code Section 90.4 provides that the HHSC Appeals Division is

000346

to conduct hearings and issue PFDs in DADS contested cases that are not transferred to SOAH in accordance with 40 Texas Administrative Code Section 90.3.

3. 40 Texas Administrative Code Section 90.3 does not provide for the transfer of formal appeals of Informal Reviews of QAF assessments to SOAH.

4. 1 Texas Administrative Code Section 352.3 in effect from September 1, 2004, through December 31, 2007, required ICF/MR providers to pay a QAF equal to 6% of reimbursements for residents, up to a total of 6% of annual gross revenues of the facility.

5. 40 Texas Administrative Code Section 11.5 provides that QAF assessments are to be paid by providers according to instructions from DADS.

6. Appellant's Medicaid Provider agreement in effect during the relevant time periods provided that Appellant was to comply with all state laws and regulations.

7. 1 TAC Section 357.456 provides that an ALJ may issue a Summary Disposition in favor of a party if there is no genuine issue of material fact and the party is entitled to disposition in its favor as a matter of law.

8. HHSC's failure to collect the full QAF that was payable under its rules did not excuse Appellant from its obligation to pay the full amount due it owed pursuant to those rules.

9. Because there are no genuine issues of material fact regarding Appellant's total gross receipts during from September 1, 2004, through December 31, 2007, DADS is entitled to collect all underpayments of Appellant's QAF up to a total of 6% of said gross receipts.

Entered this 1st day of November, 2012.

Keith Grantham
Administrative Law Judge

000347



CAUSE NO. D-1-GN-16-003653

| | | |
|---|---|---|
| CALAB, INC.; MOSAIC, INC.; MOSAIC BETHPHAGE; MOSAIC MARTIN LUTHER HOMES, INC.; THE CENTER SERVING PERSONS WITH MENTAL RETARDATION; UNIFIED CARE GROUP;<br>    *Plaintiffs,*<br><br>v.<br><br>TEXAS DEPARTMENT OF AGING AND DISABILITY SERVICES,<br>    *Defendants.* | § § § § § § § § § § § § § § | IN THE DISTRICT COURT OF<br><br><br><br><br><br><br>TRAVIS COUNTY, TEXAS<br><br><br>261st JUDICIAL DISTRICT |

## AGREED FINAL JUDGMENT GRANTING BILL OF REVIEW AND AFFIRMING AGENCY ORDERS

On September 25, 2017, this agreed final judgment came to be heard and considered. The Court finds this proposed final judgment has merit and therefore orders as follows:

1. **Bill of review.** The Plaintiffs bill of review is granted.

2. **Suits for judicial review.** These suits for judicial review present the same issue as in *Innovative Outcomes, Inc. et al, v. Texas Department of Aging and Disability Services,* No. D-1-GN-13-000999 (353 Dist. Ct., Travis County, Tex.) where the Court affirmed the agency orders. The following agency orders are hereby affirmed:

   a. Calab, Inc., HHSC Appeals Cause No. 10-0617-K;

   b. Mosaic, Inc., HHSC Appeals Cause No. 10-0764-K;

   c. Mosaic Bethphage, HHSC Appeals Cause No. 10-0763-K;

   d. Mosaic Martin Luther Homes, Inc., HHSC Appeals Cause No. 10-0762-K;

   e. The Center Serving Persons with Mental Retardation, HHSC Appeals Cause No. 10-0722-K; and

   f. Unified Care Group, HHSC Appeals Cause No. 10-0578-K.

Page 1 of 2

APPENDIX 2

3. **Costs.** Each party shall bear its own costs.

4. **Appeal.** Plaintiffs have the right to appeal this final judgment.

5. **Final judgment.** All relief not expressly granted herein is denied. This judgment disposes of all claims and all parties and is final.

IT IS SO ORDERED this 29 day of September , 2017.

_____
PRESIDING JUDGE

AGREED:

_____
Joanalys B. Smith
SMITH & ASSOCIATES
900 Ranch Road 620 South, Suite C101-159
Austin, Texas 78734
Tel: 512-261-9990
Fax: 512-261-9971
joanalys@lawofficesJBS.com
Attorney for Plaintiff

*/s/ Andrew Lutostanski*
_____
Andrew Lutostanski
Assistant Attorney General
SBN 24072217
Office of the Attorney General of Texas
Administrative Law Division
P.O. Box 12548
Austin, Texas 78711-2548
Phone: (512) 475-4200
Fax: (512) 320-0167
andrew.lutostanski@oag.texas.gov
*For Defendant DADS*

CAUSE NO. D-1-GN-13-000999

| | | |
|---|---|---|
| INNOVATIVE OUTCOMES, INC. et al, | § | IN THE DISTRICT COURT |
|     *Plaintiffs*, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| TEXAS DEPARTMENT OF AGING | § | |
| AND DISABILITY SERVICES | § | |
|     *Defendant*. | § | 353rd JUDICIAL DISTRICT |

## MODIFIED ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND AFFRIMING AGENCY FINAL ORDERS

TO THE HONORABLE JUDGE OF SAID COURT:

On this the 7th day of July, 2017 came on for consideration Defendant's Motion for Summary Judgment. The Court, HAVING REVIEWED THE Defendant's "Motion to Modify, Correct, or Reform Judgment" now finds that the previous orders signed on July 11, 2017 should be and are hereby ordered to be VACATED and the findings and orders issued on July 11, 2017 are hereby modified and superseded as follows. After considering the same and attached appendices, and after hearing the arguments of counsel and taking judicial notice of the file, the Court, having first taken the matter under advisement, is now of the opinion that the Motion should be granted.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that Defendant' Motion for Summary Judgment is hereby GRANTED.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the Final

APPENDIX 3

Agency Orders issued in Innovative Outcomes, Inc. (HHSC Appeals; Cause No. 10-0710-K), Southern Concepts, Inc. (HHSC Appeals; 10-0775-K), Volunteers of America Texas, Inc. (HHSC Appeals; 10-0689-K), SOMA Resources, Inc. (HHSC Appeals; Cause No. 10-0628-K), Knob Oak, Inc. (HHSC Appeals; Cause No. 10-0716-K), Home at Silver Quail, Inc. (HHSC Appeals; Cause No. 10-0717-K), Community Access, Inc. (HHSC Appeals; 10-0582-K), Reaching Maximum Independence, Inc. (HHSC Appeals; Cause No. 10-0579-K), Creative Community Care, Inc. (HHSC Appeals; 10-0629-K), and Premieant, Inc. (HHSC Appeals; Cause No. 10-0719-K), (collectively referred to as "Plaintiffs") are, in all things AFFIRMED.

IT IS FURTHER ORDERED that any other relief not granted in this final order is DENIED. This order is final and appealable.

SIGNED this 21st day of July, 2017

_____
PRESIDING JUDGE

2

# Texas Administrative Code

| | |
|---|---|
| TITLE 1 | ADMINISTRATION |
| PART 15 | TEXAS HEALTH AND HUMAN SERVICES COMMISSION |
| CHAPTER 352 | QUALITY ASSURANCE FEE FOR LONG-TERM CARE FACILITIES |
| RULE §352.1 | Purpose and Duration of Chapter |
| Historical | Texas Register |

(a) This chapter implements the determination, assessment, collection, and enforcement of the quality assurance fee authorized under chapter 252, Health and Safety Code, subchapter H.

(b) The purpose of the quality assurance fee established under this chapter is to improve the quality of care provided to persons with mental retardation as follows:

(1) The quality assurance fee is intended to support and/or maintain an increase in reimbursement to licensed intermediate care facilities for the mentally retarded and facilities operated according to the requirements of chapter 252, Health and Safety Code and owned and/or operated by a community mental health and mental retardation center as described in chapter 534, subchapter A, Health and Safety Code, and a facility owned by the Texas Department of Mental Health and Mental Retardation that participate in Medicaid program, subject to legislative appropriation for this purpose; and

(2) The Commission or its designee may also offset allowable expenses to administer the quality assurance fee program against revenues generated by the collection of the quality assurance fee.

(c) This chapter will expire on September 1, 2005, unless chapter 252, subchapter H, Health and Safety Code, is extended by the 79th Texas Legislature.

APPENDIX 4

**Source Note:** The provisions of this §352.1 adopted to be effective November 18, 2001, 26 TexReg 9085; amended to be effective October 29, 2003, 28 TexReg

Next Page        Previous Page

| Re-Query TAC Database | | Back to List |
|---|---|---|

**HOME** | **TEXAS REGISTER** | **TEXAS ADMINISTRATIVE CODE** | **OPEN MEETINGS**

# Texas Administrative Code

| | |
|---|---|
| TITLE 1 | ADMINISTRATION |
| PART 15 | TEXAS HEALTH AND HUMAN SERVICES COMMISSION |
| CHAPTER 352 | QUALITY ASSURANCE FEE FOR LONG-TERM CARE FACILITIES |
| RULE §352.2 | Definitions |

As used in this chapter, the following terms shall have the meanings prescribed below, unless the context clearly indicates otherwise:

(1) "Facility" means:

(A) An intermediate care facility for the mentally retarded or the corporate parent of an intermediate care facility for the mentally retarded licensed under chapter 252, Health and Safety Code; or

(B) A facility operated according to the requirements of chapter 252, Health and Safety Code, and owned and/or operated by a community mental health and mental retardation center as described in chapter 534, subchapter A, Health and Safety Code ; or

(C) A facility owned by the Texas Department of Mental Health and Mental Retardation.

(2) "Gross receipts" means money paid to a facility as compensation for services provided to patients, including client participation, but does not include charitable contributions to a facility.

(3) "Total patient days" means the sum, computed on a monthly basis, of the following:

(A) The total number of patients occupying a facility bed immediately before midnight on each day of the month; and

(B) The total number of beds that are on hold on each day of the month and that have been placed on hold for a period not to exceed three consecutive calendar days during which a patient is on therapeutic leave during the month.

(C) The total number of days a patient is discharged from a facility are not counted in the calculation of the total patient days under this chapter.

---

**Source Note:** The provisions of this §352.2 adopted to be effective November 18, 2001, 26 TexReg 9085; amended to be effective October 29, 2003, 28 TexReg 9235

Next Page          Previous Page

Re-Query TAC Database | Back to List

# Texas Administrative Code

TITLE 1            ADMINISTRATION

PART 15          TEXAS HEALTH AND HUMAN SERVICES COMMISSION

CHAPTER 352      QUALITY ASSURANCE FEE FOR LONG-TERM CARE FACILITIES

RULE §352.3       Quality Assurance Fee Determination Methodology

Historical                                         Texas Register

---

(a) Quality assurance fee on State facilities . As provided in section 1(b) of the Act of June 20, 2003, 78th Leg. R.S., (Senate Bill 1862), not later than August 31, 2003, the Texas Department of Mental Health and Mental Retardation shall pay for each facility owned by the department the quality assurance fee for patient days occurring between September 1, 2002, and July 31, 2003.

(b) Quality assurance fee. Beginning September 1, 2003, the quality assurance fee for a facility is in the amount of six percent of each reimbursement or payment rate received, including those received from the resident, for each resident in the facility during a calendar month, provided the amount of all such quality assurance fees assessed for the facility during the 12-month period following assessment of the quality assurance fee do not exceed six percent of the facility's total annual gross receipts in Texas.

(c) Not later than July 31, 2002, and every six months thereafter, the commission or its designee will review each individual facility's quality assurance fee calculation. A facility's liability for the quality assurance fee may be adjusted following this review to ensure that the quality assurance fee does not exceed six percent of annual revenue.

*not adjusted for less!*

---

**Source Note:** The provisions of this §352.3 adopted to be effective November 18, 2001, 26 TexReg 9085; amended to be effective October 29, 2003, 28 TexReg 9235

# Texas Administrative Code

| TITLE 1 | ADMINISTRATION |
| PART 15 | TEXAS HEALTH AND HUMAN SERVICES COMMISSION |
| CHAPTER 352 | QUALITY ASSURANCE FEE FOR LONG-TERM CARE FACILITIES |
| RULE §352.4 | Required reports |
| <u>Historical</u> | <u>Texas Register</u> |

(a) The following reports must be filed by a facility in accordance with the instructions of the Commission or its designee:

(1) The monthly patient day report required under subsection (c) of this section; and

(2) The semi-annual report of gross receipts required under subsection (d) of this section.

(b) Amended reports.

(1) A facility may amend a report required under subsections (c) or (d) of this section;

(2) An amended monthly patient day report must be filed no later than 10 calendar days following the filing of the report required under subsection (c) of this section.

(3) An amended report of gross receipts must be filed no later than 10 calendar days following the filing of the report required under subsection (d) of this section.

(c) Monthly patient day report.

(1) A facility must report, not later than the 20th calendar day after the last day of a month, the total number of patient days for the facility during the preceding month.

(2) A facility must file the report required by this subsection on forms or in the format and according to the instructions prescribed by the commission or its designee.

(d) Reporting of gross receipts.

(1) A facility must report, not later than the 10th calendar day following the last day of the sixth month following the effective date of this chapter, the total gross receipts the facility received during the preceding 6-month period.

(2) A facility must file the report required by this subsection on forms or in the format and according to the instructions prescribed by the commission or its designee.

---

**Source Note:** The provisions of this §352.4 adopted to be effective November 18, 2001, 26 TexReg 9085; amended to be effective October 29, 2003, 28 TexReg 9235

Next Page          Previous Page

Re-Query TAC Database | Back to List

# Texas Administrative Code

TITLE 1                    ADMINISTRATION

PART 15               TEXAS HEALTH AND HUMAN SERVICES COMMISSION

CHAPTER 352       QUALITY ASSURANCE FEE FOR LONG-TERM CARE FACILITIES

RULE §352.5         Payment and Collection of Quality Assurance Fee

---

A facility must:

(1) Pay the amount of the quality assurance fee in accordance with the instructions of the commission or its designee not later than the 30th day after the last day of the month for which the fee is assessed ; or

(2) Pay the amount of the quality assurance fee in accordance with the instructions of the commission or its designee and request an informal review of the calculation of the quality assurance fee in accordance with §352.8 of this chapter.

(3) Not later than August 31, 2003, the Texas Department of Mental Health and Mental Retardation shall pay for each facility owned by the department the quality assurance fee imposed under §352.3(a) of this title for patient days occurring between September 1, 2002, and July 31, 2003.

(4) The commission or its designee may review the calculation of the quality assurance fee to ensure its accuracy and instruct the facility to correct its calculation and payment.

---

**Source Note:** The provisions of this §352.5 adopted to be effective November 18, 2001, 26 TexReg 9085; amended to be effective October 29, 2003, 28 TexReg 9235

# Texas Administrative Code

| | |
|---|---|
| TITLE 1 | ADMINISTRATION |
| PART 15 | TEXAS HEALTH AND HUMAN SERVICES COMMISSION |
| CHAPTER 352 | QUALITY ASSURANCE FEE FOR LONG-TERM CARE FACILITIES |
| RULE §352.6 | Enforcement |

(a) The commission or its designee may audit a facility's records or the record of any corporate parent or affiliate of a facility for the purpose of determining the total patient days or gross receipts of the facility.

(b) The commission may not grant any exceptions from the quality assurance fee or the provision of any data necessary for the Commission or its designee to calculate the fee.

**Source Note:** The provisions of this §352.6 adopted to be effective November 18, 2001, 26 TexReg 9085

# Texas Administrative Code

TITLE 1                ADMINISTRATION

PART 15                TEXAS HEALTH AND HUMAN SERVICES
                       COMMISSION

CHAPTER 352            QUALITY ASSURANCE FEE FOR LONG-TERM
                       CARE FACILITIES

RULE §352.7            Penalty

(a) The commission or its designee will assess a financial penalty against a facility that:

(1) Fails to timely file the monthly facility report required under §352.4 of this chapter;

(2) Files a false, erroneous, or fraudulent monthly facility report that the commission or its designee concludes resulted in the assessment of a quality assurance fee that is less than the facility should have been assessed; or

(3) Fails to timely pay a quality assurance fee assessed under §352.5 of this chapter.

(4) A penalty assessed under this section is in an amount equal to one-half the amount of the outstanding quality assurance fee or fees, not to exceed $20,000.

(b) The commission or its designee will notify a facility in writing of the assessment of a penalty under this section and the amount of the penalty.

(c) The commission or its designee may make a referral to an appropriate authority in cases where the commission or its designee makes a good faith determination that a facility has:

(1) Committed fraud in the submission of information to the commission or its designee;

(2) Willfully submitted erroneous information to the commission or its designee; or

(3) Violated a requirement of its license or Medicaid certification.

(d) The commission or its designee may report a facility that fails to pay the quality assurance fee to the Comptroller of Public Accounts or other appropriate authority for purposes of implementing a suspension of payments to the provider.

(e) The assessment of a penalty under this section does not relieve a facility from:

(1) Providing services to patients in accordance with its obligations under contract or the law;

(2) Paying additional quality assurance fees that may be assessed to the facility; or

(3) Otherwise complying with licensure and certification requirements.

---

**Source Note:** The provisions of this §352.7 adopted to be effective November 18, 2001, 26 TexReg 9085

Next Page          Previous Page

Re-Query TAC Database          Back to List

HOME | TEXAS REGISTER | TEXAS ADMINISTRATIVE CODE | OPEN MEETINGS

# Texas Administrative Code

TITLE 1                    ADMINISTRATION

PART 15                    TEXAS HEALTH AND HUMAN SERVICES
                           COMMISSION

CHAPTER 352                QUALITY ASSURANCE FEE FOR LONG-TERM
                           CARE FACILITIES

RULE §352.8                Informal review

Texas
Register

---

(a) A facility that believes the commission or its designee incorrectly calculated the amount of a quality assurance fee as defined in this chapter may request an informal review from the commission or its designee in accordance with this section.

(b) The purpose of an informal review is to provide for the informal and efficient resolution of the matters in dispute. An informal review is not a formal administrative hearing, but is a prerequisite to obtaining a formal administrative hearing and is conducted according to the following procedures:

(1) The facility must request an informal review in writing to the commission or its designee, delivered by United States mail or special mail delivery within 20 calendar days of the date on the written notification of any of the actions described in subsection (a) of this section.

(2) A facility's written request for an informal review must include:

(A) A concise statement of the specific actions or determinations the facility disputes;

(B) The facility's recommended resolution; and

(C) Any supporting documentation the facility deems relevant to the dispute. It is the responsibility of facility to submit all pertinent information at the time of its request for an informal review.

(c) On receipt of a request for informal review, the commission or its designee assigns the review to appropriate staff.

(1) The lead staff member coordinates a review by appropriate staff of the information submitted by the interested party.

(2) Staff may request additional information from the facility, which the facility must submit in writing to the lead staff member within 14 calendar days of the request for additional information. Information received after 14 days may not be used in the panel's written decision unless the interested party receives approval of the lead staff member to submit the information after 14 days.

(d) Within 30 days of the date the request for informal review is received by the commission or its designee or the date additional requested information is received by the commission or its designee, the lead staff member must send the interested party its written decision by certified mail, return receipt requested.

---

**Source Note:** The provisions of this §352.8 adopted to be effective November 18, 2001, 26 TexReg 9085

Next Page        Previous Page

Re-Query TAC Database | Back to List

# Texas Administrative Code

TITLE 1                    ADMINISTRATION

PART 15                    TEXAS HEALTH AND HUMAN SERVICES
                           COMMISSION

CHAPTER 352                QUALITY ASSURANCE FEE FOR LONG-TERM
                           CARE FACILITIES

RULE §352.9                Formal Appeal of Penalty

Texas
Register

---

A facility that wishes to appeal the assessment of a penalty under §352.8 of this chapter may request a formal appeal from the Texas Department of Human Services in accordance with 40 T.A.C. §90.236.

---

**Source Note:** The provisions of this §352.9 adopted to be effective November 18, 2001, 26 TexReg 9085

# *A*DOPTED *R*ULES

Adopted rules include new rules, amendments to existing rules, and repeals of existing rules. A rule adopted by a state agency takes effect 20 days after the date on which it is filed with the Secretary of State unless a later date is required by statute or specified in the rule (Government Code, §2001.036). If a rule is adopted without change to the text as published in the proposed rule, then the *Texas Register* does not republish the rule text here. If a rule is adopted with change to the text of the proposed rule, then the final rule text is included here. The final rule text will appear in the Texas Administrative Code on the effective date.

## TITLE 1. ADMINISTRATION

### PART 15. TEXAS HEALTH AND HUMAN SERVICES COMMISSION

### CHAPTER 352. QUALITY ASSURANCE FEE FOR LONG-TERM CARE FACILITIES

#### 1 TAC §§352.1 - 352.5

The Health and Human Services Commission (HHSC) adopts the amendments to §352.1, concerning the purpose and duration of chapter 352, §352.2, concerning definitions, §352.3, concerning quality assurance fee, §352.4, concerning required reports, and §352.5, concerning payment and collection of the quality assurance fee, without changes to the proposed text as published in the August 29, 2003, issue of the *Texas Register* (28 TexReg 7050). The text of these amendments will not be republished. In addition, these amendments were adopted on an emergency basis in the August 29, 2003, issue of the *Texas Register* (28 TexReg 7050). The emergency adoption is being withdrawn elsewhere in this issue of the *Texas Register* as it is superseded by the adoption of these proposed amendments. The withdrawal of the emergency amendments will be effective October 29, 2003.

The adopted amendments *implement a statutorily required* change that makes the quality assurance fee applicable to facilities owned by the Texas Department of Mental Health and Mental Retardation (MHMR) beginning with the state fiscal year ending on August 31, 2003.

The amendments are adopted to comply with SB 1862, 78th Legislature, Regular Session, which requires payment by MHMR of fees for those facilities by that date; expands the possible uses of the funds; changes the definition of patient days; and, changes the time for facilities to file required reports from the 10th to the 20th day after the last day of a month. The amendments also increase the quality assurance fee from 5.5 to 6 percent beginning September 1, 2003, in accordance with projected revenues and related federal matching funds specified in the General Appropriations Act for the 2004-2005 biennium.

During the public comment period, which included public hearings on August 29, 2003 and September 25, 2003, no comments were received regarding the proposal.

The amendments are adopted under the Texas Government Code, §531.033, which authorizes the Commissioner of HHSC to adopt rules necessary to carry out the commission's duties; and under §252.205 Health and Safety Code.

This agency hereby certifies that the adoption has been reviewed by legal counsel and found to be a valid exercise of the agency's legal authority.

Filed with the Office of the Secretary of State on October 9, 2003.

TRD-200306643
Steve Aragón
General Counsel
Texas Health and Human Services Commission
Effective date: October 29, 2003
Proposal publication date: August 29, 2003
For further information, please call: (512) 424-6576

♦ ♦ ♦

## TITLE 4. AGRICULTURE

### PART 1. TEXAS DEPARTMENT OF AGRICULTURE

### CHAPTER 10. SEED CERTIFICATION STANDARDS

### SUBCHAPTER A. GENERAL REQUIREMENTS

#### 4 TAC §10.3

The Texas State Seed and Plant Board (the Board) adopts an amendment to §10.3, *concerning approval of an applicant for seed certification*, without changes to the proposal published in June 27, 2003, issue of the *Texas Register* (28 TexReg 4760). The amendment is adopted to increase fees for licensing as a Registered Plant Breeder. The fees increased by this adoption have not been increased by the Board since 1987. The increase in fees will allow the Board and the Texas Department of Agriculture (the department) to recover costs associated with enforcing the standards adopted by the Board, as directed by the 78th Legislature, Regular Session, 2003. The amendment to §10.3 increases from $100 to $120 the license fee for licensing as a Registered Plant Breeder.

Comments were received regarding the proposed fee increase and other increases made to seed certification fees from Texas Farm Bureau (TFB) and the Texas Seed Trade Association (TSTA). The TFB, through its President, Kenneth Dierschke, commented that it supports and appreciates the department's functions and services, but that it feels the increased fees are not appropriate and do not reflect the instructions of the state leadership not to raise taxes. The TFB further stated its belief that fees collected by the department should be used to fund the services provided to the segment of the population paying the fees and not to fund services to the general public, and that agency services should be funded by general revenue. The TSTA, through its Executive Director, Charles Leamons, also voiced similar concerns regarding the fee increases,

Texas. Secretary of State. Texas Register, *Volume 28, Number 43, Pages 9133*-9326, October 24, 2003, periodical, October 24, 2003; Austin, Texas. (texashistory.unt.edu/ark:/67531/metapth101071/m1/101/?utm_source=email&utm_medium=client&utm_content=ark_sidebar&utm_campaign=ark_permanent: accessed June 28, 2017), University of North Texas Libraries, The Portal to Texas History, texashistory.unt.edu; crediting UNT Libraries Government Documents Department.

APPENDIX 5

Sec. 2001.174.  REVIEW UNDER SUBSTANTIAL EVIDENCE RULE OR UNDEFINED SCOPE OF REVIEW.  If the law authorizes review of a decision in a contested case under the substantial evidence rule or if the law does not define the scope of judicial review, a court may not substitute its judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion but:

    (1)  may affirm the agency decision in whole or in part;  and

    (2)  shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

        (A)  in violation of a constitutional or statutory provision;

        (B)  in excess of the agency's statutory authority;

        (C)  made through unlawful procedure;

        (D)  affected by other error of law;

        (E)  not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or

        (F)  arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Added by Acts 1993, 73rd Leg., ch. 268, Sec. 1, eff. Sept. 1, 1993.

APPENDIX 6

# Texas Administrative Code

TITLE 1              ADMINISTRATION

PART 15              TEXAS HEALTH AND HUMAN SERVICES
                     COMMISSION

CHAPTER 352          QUALITY ASSURANCE FEE

RULE §352.1          Purpose of Chapter

Repealed Date:       **03/01/2010**

Historical                                                        Texas
                                                                  Register

---

(a) This chapter implements the determination, assessment, collection, and enforcement of the quality assurance fee authorized under chapter 252, Health and Safety Code, subchapter H.

(b) The purpose of the quality assurance fee established under this chapter is to improve the quality of care provided to persons with mental retardation as follows:

   (1) The quality assurance fee is intended to support and/or maintain an increase in reimbursement to facilities that participate in the Medicaid program, subject to legislative appropriation for this purpose; and

   (2) The Department of Aging and Disability Services (DADS) may also offset allowable expenses to administer the quality assurance fee program against revenues generated by the collection of the quality assurance fee.

---

**Source Note:** The provisions of this §352.1 adopted to be effective November 18, 2001, 26 TexReg 9085; amended to be effective October 29, 2003, 28 TexReg 9235; amended to be effective February 3, 2008, 33 TexReg 667

APPEND1X 7

# Texas Administrative Code

| | |
|---|---|
| TITLE 1 | ADMINISTRATION |
| PART 15 | TEXAS HEALTH AND HUMAN SERVICES COMMISSION |
| CHAPTER 352 | QUALITY ASSURANCE FEE |
| RULE §352.2 | Definitions |
| Repealed Date: | **03/01/2010** |
| Historical | Texas Register |

---

As used in this chapter, the following terms shall have the meanings prescribed below, unless the context clearly indicates otherwise:

(1) "DADS" means: The Department of Aging and Disability Services.

(2) "Facility" means:

(A) An intermediate care facility for the mentally retarded or the corporate parent of an intermediate care facility for the mentally retarded licensed under chapter 252, Health and Safety Code; or

(B) A facility operated according to the requirements of chapter 252, Health and Safety Code, and owned and/or operated by a community mental health and mental retardation center as described in chapter 534, subchapter A, Health and Safety Code; or

(C) A facility owned by DADS.

(3) "Gross receipts" means money paid to a facility as compensation for services provided to residents, including resident participation, but does not include charitable contributions to a facility. Gross receipts are defined as accrued payments and not as cash received.

(4) "Total patient days" means the sum, computed on a monthly basis, of the following:

(A) The total number of residents occupying a facility bed immediately before midnight on each day of the month; and

(B) The total number of beds that are on hold on each day of the month and that have been placed on hold for a period not to exceed three consecutive calendar days during which a resident is on therapeutic leave during the month.

(C) The total number of days a resident is discharged from a facility are not counted in the calculation of the total patient days under this chapter.

---

**Source Note:** The provisions of this §352.2 adopted to be effective November 18, 2001, 26 TexReg 9085; amended to be effective October 29, 2003, 28 TexReg 9235; amended to be effective February 3, 2008, 33 TexReg 667

Next Page          Previous Page

Re-Query TAC Database          Back to List

HOME | TEXAS REGISTER | TEXAS ADMINISTRATIVE CODE | OPEN MEETINGS

# Texas Administrative Code

| | |
|---|---|
| TITLE 1 | ADMINISTRATION |
| PART 15 | TEXAS HEALTH AND HUMAN SERVICES COMMISSION |
| CHAPTER 352 | QUALITY ASSURANCE FEE |
| RULE §352.3 | Quality Assurance Fee Determination Methodology |
| Repealed Date: | **03/01/2010** |

Historical

(a) Quality assurance fee. Effective January 1, 2008, the quality assurance fee for a facility is five and one half percent of a facility owner's gross receipts.

(b) Quality assurance fee review. Every twelve months on a schedule determined by DADS, DADS will review each facility owner's quality assurance fee payments from all of the owner's facilities combined. A facility owner's liability for the quality assurance fee may be adjusted following this review to ensure that the quality assurance fee equals five and one half percent of annual gross receipts from all facilities.

**Source Note:** The provisions of this §352.3 adopted to be effective November 18, 2001, 26 TexReg 9085; amended to be effective October 29, 2003, 28 TexReg 9235; amended to be effective February 3, 2008, 33 TexReg 667

# Texas Administrative Code

| | |
|---|---|
| TITLE 1 | ADMINISTRATION |
| PART 15 | TEXAS HEALTH AND HUMAN SERVICES COMMISSION |
| CHAPTER 352 | QUALITY ASSURANCE FEE |
| RULE §352.4 | Required reports |
| Repealed Date: | **03/01/2010** |
| Historical | Texas Register |

(a) The following reports must be filed by a facility in accordance with DADS instructions:

  (1) The monthly patient day report required under subsection (c) of this section; and

  (2) The annual report of gross receipts required under subsection (d) of this section.

(b) Amended reports.

  (1) A facility may amend a report required under subsections (c) or (d) of this section;

  (2) An amended monthly patient day report must be filed no later than 20 calendar days after the last day of the month for which the report was filed.

  (3) An amended report of gross receipts must be filed no later than 10 calendar days after the filing of the report required under subsection (d) of this section.

(c) Monthly patient day report.

  (1) A facility must report, not later than the 10th calendar day after the last day of a month, the total number of patient days for the facility during the preceding month.

(2) A facility must file the report required by this subsection on forms or in the format and according to the instructions prescribed by DADS.

(d) Reporting of gross receipts.

(1) A facility must report, no later than October 31 of each year, money paid to the facility by private-pay residents and money paid to the facility for bed-hold fees for the period of September 1 through August 31 immediately preceding the report. DADS will use the Durable Medical Equipment and Applied Income amounts on file with the Claims Management System and the amounts reported by the facility for private-pay and bed-hold to determine the total gross receipts.

(2) A facility must file the report required by this subsection on forms or in the format and according to the instructions prescribed by DADS.

---

**Source Note:** The provisions of this §352.4 adopted to be effective November 18, 2001, 26 TexReg 9085; amended to be effective October 29, 2003, 28 TexReg 9235; amended to be effective February 3, 2008, 33 TexReg 667

Next Page          Previous Page

Re-Query TAC Database | Back to List

# Texas Administrative Code

| | |
|---|---|
| TITLE 1 | ADMINISTRATION |
| PART 15 | TEXAS HEALTH AND HUMAN SERVICES COMMISSION |
| CHAPTER 352 | QUALITY ASSURANCE FEE |
| RULE §352.5 | Payment and Collection of Quality Assurance Fee |
| Repealed Date: | **03/01/2010** |

Historical

Texas
Register

---

(a) A facility must:

  (1) Pay the amount of the quality assurance fee in accordance with DADS instructions not later than the 30th day after the last day of the month for which the fee is assessed; or

  (2) Pay the amount of the quality assurance fee in accordance with DADS instructions and request an informal review of the calculation of the quality assurance fee in accordance with §352.8 of this chapter.

(b) DADS may review the calculation of the quality assurance fee to ensure its accuracy and instruct the facility to correct its calculation and payment.

---

**Source Note:** The provisions of this §352.5 adopted to be effective November 18, 2001, 26 TexReg 9085; amended to be effective October 29, 2003, 28 TexReg 9235; amended to be effective February 3, 2008, 33 TexReg 667

# Texas Administrative Code

| | |
|---|---|
| TITLE 1 | ADMINISTRATION |
| PART 15 | TEXAS HEALTH AND HUMAN SERVICES COMMISSION |
| CHAPTER 352 | QUALITY ASSURANCE FEE |
| RULE §352.6 | Enforcement |
| Repealed Date: | **03/01/2010** |

(a) DADS monitors a facility's records or the record of any corporate parent or affiliate of a facility for the purpose of determining the total patient days and gross receipts of the facility.

(b) The Health and Human Services Commission (HHSC) and DADS may not grant any exceptions from the quality assurance fee or the provision of any data necessary for DADS to calculate the fee.

(c) HHSC or its designee audits quality assurance fee determinations in accordance with this subsection.

(1) HHSC or its designee periodically audits the records of a facility and, if necessary, the corporate parent or affiliate of a facility to verify the amount of the quality assurance fee owned by the facility. The facility must allow HHSC or its designee to review and photocopy any records necessary to conduct the audit.

(2) If a facility fails to maintain records or fails to allow HHSC or its designee to review and photocopy any records necessary to conduct an audit, an audit will be conducted with the records available.

(3) HHSC or its designee provides the facility with a report of the final audit findings.

(4) If the final audit findings show the facility owes additional amounts for the quality assurance fee, DADS notifies the facility of the amount due. If the final

audit findings show the facility is owed money due to overpayment of the quality assurance fee, DADS refunds the amount owed to the facility owner.

**Source Note:** The provisions of this §352.6 adopted to be effective November 18, 2001, 26 TexReg 9085; amended to be effective February 3, 2008, 33 TexReg 667

Next Page          Previous Page

Re-Query TAC Database          Back to List

# Texas Administrative Code

| | |
|---|---|
| TITLE 1 | ADMINISTRATION |
| PART 15 | TEXAS HEALTH AND HUMAN SERVICES COMMISSION |
| CHAPTER 352 | QUALITY ASSURANCE FEE |
| RULE §352.7 | Penalty |
| Repealed Date: | **03/01/2010** |
| Historical | Texas Register |

(a) DADS will assess a financial penalty against a facility that:

(1) Fails to timely file the monthly facility report required under §352.4 of this chapter;

(2) Files a false, erroneous, or fraudulent monthly facility report that DADS concludes resulted in the assessment of a quality assurance fee that is less than the facility should have been assessed; or

(3) Fails to timely pay a quality assurance fee assessed under §352.5 of this chapter.

(b) A penalty assessed under this section is an amount equal to one-fourth the amount of the quality assurance fee for each month the quality assurance fee is late, not reported or unpaid.

(c) DADS will notify a facility in writing of the assessment of a penalty under this section and the amount of the penalty.

(d) DADS may make a referral to an appropriate authority in cases where it makes a good faith determination that a facility has:

(1) Committed fraud in the submission of information to DADS;

(2) Willfully submitted erroneous information to DADS; or

(3) Violated a requirement of its license or Medicaid certification.

(e) DADS may suspend payments to a facility that fails to pay or report the quality assurance fee.

(f) The assessment of a penalty under this section does not relieve a facility from:

(1) Providing services to residents in accordance with its obligations under contract or the law;

(2) Paying additional quality assurance fees that may be assessed to the facility; or

(3) Otherwise complying with licensure and certification requirements.

---

**Source Note:** The provisions of this §352.7 adopted to be effective November 18, 2001, 26 TexReg 9085; amended to be effective February 3, 2008, 33 TexReg 667

# Texas Administrative Code

| TITLE 1 | ADMINISTRATION |
|---|---|
| PART 15 | TEXAS HEALTH AND HUMAN SERVICES COMMISSION |
| CHAPTER 352 | QUALITY ASSURANCE FEE |
| RULE §352.8 | Informal review |
| Repealed Date: | **03/01/2010** |

---

(a) A facility that believes DADS incorrectly calculated the amount of a quality assurance fee as defined in this chapter may request an informal review from DADS in accordance with this section.

(b) The purpose of an informal review is to provide for the informal and efficient resolution of the matters in dispute. An informal review is not a formal administrative hearing, but is a prerequisite to obtaining a formal administrative hearing and is conducted according to the following procedures:

(1) The facility must request an informal review in writing to DADS, delivered by United States mail or special mail delivery to DADS no later than 20 calendar days after the date on the written notification of a calculation described in subsection (a) of this section.

(2) A facility's written request for an informal review must include:

(A) A concise statement of the specific actions or determinations the facility disputes;

(B) The facility's recommended resolution; and

(C) Any supporting documentation the facility deems relevant to the dispute. It is the responsibility of facility to submit all pertinent information at the time of its request for an informal review.

(c) On receipt of a request for informal review, DADS assigns the review to appropriate staff.

(1) DADS coordinates a review by appropriate staff of the information submitted by the facility.

(2) DADS may request additional information from the facility, which the facility must submit in writing to DADS within 14 calendar days after the request for additional information. Information received after 14 days may not be used in DADS written decision unless the interested party receives approval from DADS to submit the information after 14 days.

(d) Within 30 days after the date the request for informal review is received by DADS or the date additional requested information is received by DADS, DADS sends the facility its written decision by certified mail, return receipt requested.

---

**Source Note:** The provisions of this §352.8 adopted to be effective November 18, 2001, 26 TexReg 9085; amended to be effective February 3, 2008, 33 TexReg 667

Next Page          Previous Page

| Re-Query TAC Database | Back to List |

# Texas Administrative Code

TITLE 1              ADMINISTRATION
PART 15             TEXAS HEALTH AND HUMAN SERVICES
                    COMMISSION
CHAPTER 352         QUALITY ASSURANCE FEE
RULE §352.9         Appeal of an Informal Review Decision
Repealed Date:      **03/01/2010**
Historical                                              Texas
                                                        Register

A facility that wishes to appeal an informal review decision under §352.8 of this chapter may request a hearing from the Health and Human Services Commission in accordance with Chapter 357, Subchapter I of this title (relating to Hearings Under the Administrative Procedure Act).

**Source Note:** The provisions of this §352.9 adopted to be effective November 18, 2001, 26 TexReg 9085; amended to be effective February 3, 2008, 33 TexReg 667

# ADOPTED RULES

Adopted rules include new rules, amendments to existing rules, and repeals of existing rules. A rule adopted by a state agency takes effect 20 days after the date on which it is filed with the Secretary of State unless a later date is required by statute or specified in the rule (Government Code, §2001.036). If a rule is adopted without change to the text of the proposed rule, then the *Texas Register* does not republish the rule text here. If a rule is adopted with change to the text of the proposed rule, then the final rule text is included here. The final rule text will appear in the Texas Administrative Code on the effective date.

## TITLE 1. ADMINISTRATION

## PART 15. TEXAS HEALTH AND HUMAN SERVICES COMMISSION

## CHAPTER 352. QUALITY ASSURANCE FEE

### 1 TAC §§352.1 - 352.9

The Texas Health and Human Services Commission (HHSC) adopts amendments to §§352.1 - 352.9, concerning the quality assurance fee for the Intermediate Care Facilities for Persons with Mental Retardation (ICF/MR) program, without changes to the proposed text as published in the November 2, 2007, issue of the *Texas Register* (32 TexReg 7789) and will not be republished.

The amendments update the ICF/MR quality assurance fee rules by revising the quality assurance fee percentage to reflect the maximum 5.5 percent fee allowed under the federal Tax Relief and Health Care Act of 2006 (TRHCA), P.L. 109-432, Section 403, which amended Section 1903(w)(4)(C) of the Social Security Act (42 U.S.C. 1396b(w)(4)(C)). This law took effect on January 1, 2008. The 5.5 percent maximum allowed for ICF/MR facilities in the TRHCA represents a 0.5 percent reduction in matchable ICF/MR quality assurance fees. The effect of this law is that contracted ICF/MR providers will pay less in quality assurance fees to the state than they currently pay. In addition, the amendments update administrative procedures relating to the quality assurance fee, remove outdated language, and update references to reflect that the Department of Aging and Disability Services (DADS) has administrative responsibility for the quality assurance fee.

The purpose of the amendments are to revise the ICF/MR quality assurance fee rules to reflect the new maximum quality assurance fee allowed under the TRHCA and to provide clear guidance to agency staff and providers on quality assurance fee reporting requirements and calculations, monitoring and auditing responsibilities, penalties, informal review and formal appeal rights and responsibilities. As part of updating administrative procedures, the amendments clarify how penalties for non-payment of the fee will be calculated and require DADS to collect underpayments and refund overpayments of fees. In addition, the deadlines regarding the submittal of required reports are changed or clarified, and the definition of "gross receipts" is clarified to mean "accrued payments" and not "cash received." Finally, language is added to allow DADS to reconcile overpayments and underpayments of the fee to 5.5 percent of annual gross receipts at the corporate entity level for those entities that control more than one facility.

The 30-day comment period ended December 2, 2007, and HHSC did not receive any comments on the proposed amendments.

The amendments are adopted under the Texas Government Code, §531.033, which provides the Executive Commissioner of HHSC with broad rulemaking authority; and the Human Resource Code §32.021 and Texas Government Code §531.021(a), which provide HHSC with the authority to administer the federal medical assistance (Medicaid) program in Texas.

This agency hereby certifies that the adoption has been reviewed by legal counsel and found to be a valid exercise of the agency's legal authority.

Filed with the Office of the Secretary of State on January 14, 2008.

TRD-200800150
Steve Aragón
Chief Counsel
Texas Health and Human Services Commission
Effective date: February 3, 2008
Proposal publication date: November 2, 2007
For further information, please call: (512) 424-6900

♦ ♦ ♦

## CHAPTER 355. REIMBURSEMENT RATES

The Texas Health and Human Services Commission (HHSC) adopts amendments to §355.503, concerning Reimbursement Methodology for the Community-Based Alternatives (CBA) Waiver Program and the Integrated Care Management-Home and Community Support Services and Assisted Living/Residential Care Programs; §355.505, concerning Reimbursement Methodology for the Community Living Assistance and Support Services (CLASS) Waiver Program; and §355.5902, concerning Reimbursement Methodology for Primary Home Care (PHC), without changes to the proposed text as published in the November 9, 2007, issue of the *Texas Register* (32 TexReg 8073) and will not be republished.

One amendment to §355.503(d)(2) adds subparagraph (D), which sets out a reimbursement methodology for Personal Care III that: (1) models the direct care portion of the payment rate using program staffing requirements; and (2) ties the non-direct care portion of the rate to the non-attendant portion of the non-apartment assisted living rate for a provider that does not participate in receiving rate add-ons in the Attendant Compensation Rate Enhancement.

A second amendment to §355.503 adds subsection (f)(3); the amendment to §355.505 amends subsection (c)(2); and the amendment to §355.5902 amends subsection (b)(1). These

Texas. Secretary of State. Texas Register, Volume 33, Number 4, Pages 635-808, January 25, 2008, periodical, January 25, 2008; Austin, Texas. (texashistory.unt.edu/ark:/67531/metapth90778/m1/31/? q=texas%20register%20volume%2033%20: accessed December 29, 2017), University of North Texas Libraries, The Portal to Texas History, texashistory.unt.edu; crediting UNT Libraries Government Documents Department.

APPENDIX 8

## PART 15. TEXAS HEALTH AND HUMAN SERVICES COMMISSION

### CHAPTER 352. QUALITY ASSURANCE FEE

1 TAC §§352.1 - 352.9

The Health and Human Services Commission (HHSC) proposes amendments to §§352.1 - 352.9, concerning the quality assurance fee for the Intermediate Care Facilities Mental Retardation (ICF/MR) program.

Background and Justification

These rule proposals establish the quality assurance fee for facilities in the ICF/MR program. HHSC, under its authority and responsibility to administer and implement rates, is updating the quality assurance fee rules by revising the quality assurance fee percentage to reflect the maximum 5.5 percent fee allowed under the federal Tax Relief and Health Care Act of 2006 (TRHCA), P.L. 109-432, Section 403, which amended Section 1903(w)(4)(C) of the Social Security Act (42 U.S.C. 1396b(w)(4)(C)). This law takes effect on January 1, 2008. The 5.5 percent maximum allowed for ICF/MR facilities in the TRHCA represents a 0.5 percent reduction in matchable ICF/MR quality assurance fees. The effect of this law is that contracted ICF/MR providers will pay less in quality assurance fees to the state than they currently pay. In addition, this proposal updates administrative procedures relating to the quality assurance fee, removes outdated language, and updates references to reflect that the Department of Aging and Disability Services (DADS) has administrative responsibility for the quality assurance fee.

Section-by-Section Summary

The proposed amendment revises §352.1 to:

Remove from subsection (b)(1) extraneous language currently also included in §352.2(1) in the definition of facility.

Replace in subsection (b)(2) references to the "Commission or its designee" with references to DADS, which is the agency responsible for the administration of the quality assurance fee.

Remove subsection (c) because Chapter 252 of the Health and Safety Code was amended by the 79th Legislature to remove an embedded expiration date, making this subsection obsolete.

Rename the section to better describe its contents.

The proposed amendment revises §352.2 to:

Add a paragraph defining DADS and renumber subsequent paragraphs.

Replace in the newly renumbered paragraph (2)(C) the reference to the "Texas Department of Mental Health and Mental Retardation (TDMHMR)" with a reference to DADS.

Clarify in the newly renumbered paragraph (3) that gross receipts are defined as accrued payments and not as cash received.

The proposed amendment revises §352.3 to:

Remove subsection (a), which is outdated, and renumber the succeeding subsections accordingly.

Revise the rule to reflect that the quality assurance fee is 5.5 percent of a facility's gross receipts effective January 1, 2008.

Remove an outdated date; replace references to the "Commission or its designee" with references to DADS; add language to require that quality assurance fee reviews are conducted every

12-months; add language to allow DADS to make adjustments to ensure that the quality assurance fee equals 5.5 percent of each facility's gross receipts; and add language to indicate that, for entities controlling more than one facility, quality assurance fee reviews are conducted at the entity, rather than the facility level.

The proposed amendment revises §352.4 to:

Replace references to the "Commission or its designee" with references to DADS, which is responsible for the administration of the quality assurance fee.

Revise subsection (a)(2) to require annual reports of gross receipts instead of semi-annual reports.

Revise the due date for submitting amended monthly patient day reports in subsection (b)(2) from 10 calendar days following the filing of the report to 20 calendar days after the last day of the month for which the report was filed.

Revise the due date for submitting amended reports to gross receipts in subsection (b)(3) from 10 calendar days "following" filing the report to 10 days "after" filing the report.

Revise the due date for submitting the monthly patient day report in subsection (c)(1) from 20 calendar days after the last day of the month to 10 calendar days after the last day of the month.

Revise subsection (d)(1) to indicate that facilities must report money paid to the facility by private-pay residents and for bed-hold fees during each state fiscal year by October 31 each year and to indicate that DADS will use this information, along with the Durable Medical Equipment and Applied income amounts on file with the Claims Management System, to determine total gross receipts.

The proposed amendment revises §352.5 to:

Replace references to the "Commission or its designee" with references to DADS, which is responsible for the administration of the quality assurance fee.

Delete paragraph (3), which is outdated.

Add new subsection (a) and re-designate paragraph (4) as subsection (b) such that subsection (a) is a list of facility requirements and subsection (b) is not a part of that list.

The proposed amendment revises §352.6 to:

Replace references to the "Commission or its designee" with references to DADS, which is responsible for the administration of the quality assurance fee.

Indicate that DADS monitors facilities' records but does not audit them.

Indicate that HHSC or its designee audits quality assurance fee determinations for accuracy.

The proposed amendment revises §352.7 to:

Replace references to the "Commission or its designee" with references to DADS, which is responsible for the administration of the quality assurance fee.

Renumber subsection (a)(4) as subsection (b) and clarify that the financial penalty is equal to one-fourth the amount of the quality assurance fee for each month the quality assurance fee is late, not reported, or unpaid.

Re-designate the remaining subsections appropriately.

Texas. Secretary of State. Texas Register, Volume 32, Number 44, Pages 7777-8060, November 2, 2007, periodical, November 2, 2007; Austin, Texas. (texashistory.unt.edu/ark:/67531/metapth97421/m1/11/?utm_source=email&utm_medium=client&utm_content=ark_sidebar&utm_campaign=ark_permanent: accessed June 28, 2017), University of North Texas Libraries, The Portal to Texas History, texashistory.unt.edu; crediting UNT Libraries Government Documents Department.

APPENDIX 9

Modify new subsection (e) to indicate that DADS may suspend payments to a facility that fails to pay or report the quality assurance fee.

The proposed amendment revises §352.8 to:

Replace references to the 'Commission or its designee' with references to DADS, which is responsible for the administration of the quality assurance fee.

Clarify in subsection (b)(1) that a request for an informal review must be received by DADS no later than 20 calendar days after the date on the written notification of the calculation of the quality assurance fee.

Replace references to 'staff,' 'lead staff,' and 'panel' with references to DADS.

Clarify in subsection (d) that DADS sends its written decision within "30 days after" rather than "within 30 days of," the date the request for informal review is received by DADS and that the decision is sent to the "facility" rather than the "interested party."

The proposed amendment revises §352.9 to:

Remove reference to the appeal as being for the assessment of a penalty and replace it with a reference to the appeal as being for an informal review decision, since this section refers to §352.8 which governs informal reviews, not assessments of penalties.

Replace references to the 'Commission or its designee' with references to DADS, which is responsible for the administration of the quality assurance fee.

Change an incorrect reference to the formal appeal rules related to HHSC programs.

Fiscal Note

Gordon E. Taylor, Chief Financial Officer for the Department of Aging and Disability Services, has determined that, during the first five-year period the amended rules are in effect there will be a fiscal impact to state government of $3,078,151 for state fiscal year (SFY) 2008; $4,617,227 for SFY 2009; $4,617,227 for SFY 2010; $4,617,227 for SFY 2011; and $4,617,227 for SFY 2012 as a result of changing the amount of the quality assurance fee that is collected from 6 percent to 5.5 percent. The proposed rule amendments will not result in any fiscal implications for local health and human services agencies. There are no fiscal implications for local governments as a result of enforcing or administering the amended sections.

Small Business and Micro-business Impact Analysis

HHSC has determined that there is no adverse economic effect on small businesses or micro-businesses as a result of enforcing or administering the proposed amendment. The implementation of these proposed rule amendments does not require any changes in practice or any additional cost to the contracted provider.

HHSC does not anticipate that there will be any economic cost to persons who are required to comply with this proposed amendment. The amendment will not affect local employment.

Public Benefit

Carolyn Pratt, Director of Rate Analysis, has determined that, for each of the first five years the proposed rule amendments are in effect, the expected public benefit is that obsolete rule language will be eliminated; references to TDMHMR, which no longer exists, will be removed and replaced with references to DADS, the

agency currently responsible for administering the ICF/MR program; and the rules will provide clear guidance to agency staff and providers on quality assurance fee reporting requirements and calculations, monitoring and auditing responsibilities, penalties, informal review and formal appeal rights and responsibilities. Finally, the public will benefit because the rules will reflect the new maximum quality assurance fee allowed under the federal Tax Relief and Health Care Act of 2006, P.L. 109-432, Section 403 effective January 1, 2008.

Takings Impact Assessment

HHSC has determined that this proposal does not restrict or limit an owner's right to his or her property that would otherwise exist in the absence of government action and, therefore, does not constitute a taking under Texas Government Code, §2007.043.

Regulatory Analysis

HHSC has determined that this proposal is not a "major environmental rule" as defined by §2001.0225 of the Texas Government Code. "Major environmental rule" is defined to mean a rule the specific intent of which is to protect the environment or reduce risk to human health from environmental exposure and that may adversely affect, in a material way, the economy, a sector of the economy, productivity, competition, jobs, the environment or the public health and safety of a state or a sector of the state. This proposal is not specifically intended to protect the environment or reduce risks to human health from environmental exposure.

Public Comment

Questions about the content of this proposal may be directed to Pam McDonald in the HHSC Rate Analysis Department by telephone at (512) 491-1373. Written comments on the proposal may be submitted to Ms. McDonald by facsimile at (512) 491-1998, by e-mail to pam.mcdonald@hhsc.state.tx.us, or by mail to HHSC Rate Analysis, Mail Code H-400, P.O. Box 85200, Austin, Texas 78708-5200, within 30 days of publication of this proposal in the *Texas Register.*

Statutory Authority

The amendments are proposed under the Texas Government Code, §531.033, which provides the Executive Commissioner of HHSC with broad rulemaking authority; and the Human Resource Code, §32.021 and Texas Government Code, §531.021(a), which provide HHSC with the authority to administer the federal medical assistance (Medicaid) program in Texas.

The proposed amendments affect the Human Resources Code, Chapter 32, and the Texas Government Code, Chapter 531. No other statutes, articles, or codes are affected by this proposal.

*§352.1. Purpose [and Duration] of Chapter.*

(a) This chapter implements the determination, assessment, collection, and enforcement of the quality assurance fee authorized under chapter 252, Health and Safety Code, subchapter H.

(b) The purpose of the quality assurance fee established under this chapter is to improve the quality of care provided to persons with mental retardation as follows:

(1) The quality assurance fee is intended to support and/or maintain an increase in reimbursement to [licensed intermediate care] facilities [for the mentally retarded and facilities operated according to the requirements of chapter 252, Health and Safety Code and owned and/or operated by a community mental health and mental retardation center as described in chapter 534, subchapter A, Health and Safety Code, and a facility owned by the Texas Department of Mental Health

# Texas Administrative Code

TITLE 1                    ADMINISTRATION

PART 15                    TEXAS HEALTH AND HUMAN SERVICES
                           COMMISSION

CHAPTER 357                HEARINGS

SUBCHAPTER I               HEARINGS UNDER THE ADMINISTRATIVE
                           PROCEDURE ACT

RULE §357.483              Powers and Duties of the Judge

Historical                                                      Texas
                                                                Register

---

(a) The judge is a designee of the HHSC Executive Commissioner for purposes of:

   (1) issuing default, final, and other orders, and

   (2) ruling on any motions for rehearing.

(b) The judge shall have the authority and the duty to:

   (1) regulate pre-hearing matters and the hearing;

   (2) conduct a full, fair, and impartial hearing;

   (3) take action to avoid unnecessary delay in the disposition of the proceeding; and

   (4) maintain order, including regulating the conduct of the parties, authorized representatives, witnesses, observers, and other participants.

(c) The judge may issue any order in the interest of justice that is necessary to protect the person or party seeking relief from undue burden, unnecessary expense, harassment, or invasion of personal, constitutional, or property rights.

(d) The judge has no authority to declare state statutes or rules, or federal statutes or regulations, invalid.

APPENDIX 10

---

**Source Note:** The provisions of this §357.483 adopted to be effective June 20, 2007, 32 TexReg 3544

Next Page          Previous Page

Re-Query TAC Database      Back to List

## 42 CFR 433.68 - Permissible health care-related taxes.

### § 433.68 Permissible health care-related taxes.

(a) *General rule.* A State may receive health care-related taxes, without a reduction in FFP, only in accordance with the requirements of this section.

(b) *Permissible health care-related taxes.* Subject to the limitations specified in § 433.70, a State may receive, without a reduction in FFP, health care-related taxes if all of the following are met:

(1) The taxes are broad based, as specified in paragraph (c) of this section;

(2) The taxes are uniformly imposed throughout a jurisdiction, as specified in paragraph (d) of this section; and

(3) The tax program does not violate the hold harmless provisions specified in paragraph (f) of this section.

(c) *Broad based health care-related taxes.*

(1) A health care-related tax will be considered to be broad based if the tax is imposed on at least all health care items or services in the class or providers of such items or services furnished by all non-Federal, non-public providers in the State, and is imposed uniformly, as specified in paragraph (d) of this section.

(2) If a health care-related tax is imposed by a unit of local government, the tax must extend to all items or services or providers (or to all providers in a class) in the area over which the unit of government has jurisdiction.

(3) A State may request a waiver from CMS of the requirement that a tax program be broad based, in accordance with the procedures specified in § 433.72. Waivers from the uniform and broad-based requirements will automatically be granted in cases of variations in licensing and certification fees for providers if the amount of such fees is not more than $1,000 annually per provider and the total amount raised by the State from the fees is used in the administration of the licensing or certification program.

(d) *Uniformly imposed health care-related taxes.* A health care-related tax will be considered to be imposed uniformly even if it excludes Medicaid or Medicare payments (in whole or in part), or both; or, in the case of a health care-related tax based on revenues or receipts with respect to a class of items or services (or providers of items or services), if it excludes either Medicaid or Medicare revenues with respect to a class of items or services, or both. The exclusion of Medicaid revenues must be applied uniformly to all providers being taxed.

(1) A health care-related tax will be considered to be imposed uniformly if it meets any one of the following criteria:

(i) If the tax is a licensing fee or similar tax imposed on a class of health care services (or providers of those health care items or services), the tax is the same amount for every provider furnishing those items or services within the class.

(ii) If the tax is a licensing fee or similar tax imposed on a class of health care items or services (or providers of those items or services) on the basis of the number of beds (licensed or otherwise) of the provider, the amount of the tax is the same for each bed of each provider of those items or services in the class.

(iii) If the tax is imposed on provider revenue or receipts with respect to a class of items or services (or providers of those health care items or services), the tax is imposed at a uniform rate for all services (or providers of those items or services) in the class on all the gross revenues or receipts, or on net operating revenues relating to the provision of all items or services in the State, unit, or jurisdiction. Net operating revenue means gross charges of facilities less any deducted amounts for bad debts, charity care, and payer discounts.

(iv) The tax is imposed on items or services on a basis other than those specified in paragraphs (d)(1) (i) through (iii) of this section, e.g., an admission tax, and the State establishes to the satisfaction of the Secretary that the amount of the tax is the same for each provider of such items or services in the class.

(2) A tax imposed with respect to a class of health care items or services will not be considered to be imposed uniformly if it meets either one of the following two criteria:

(i) The tax provides for credits, exclusions, or deductions which have as its purpose, or results in, the return to providers of all, or a portion, of the tax paid, and it results, directly or indirectly, in a tax program in which -

(A) The net impact of the tax and payments is not generally redistributive, as specified in paragraph (e) of this section; and

(B) The amount of the tax is directly correlated to payments under the Medicaid program.

(ii) The tax holds taxpayers harmless for the cost of the tax, as described in paragraph (f) of this section.

(3) If a tax does not meet the criteria specified in paragraphs (d)(1)(i) through (iv) of this section, but the State establishes that the tax is imposed uniformly in accordance with the procedures for a waiver specified in § 433.72, the tax will be treated as a uniform tax.

(e) *Generally redistributive.* A tax will be considered to be generally redistributive if it meets the requirements of this paragraph. If the State desires waiver of only the broad-based tax requirement, it must demonstrate compliance with paragraph (e)(1) of this section. If the State desires waiver of the uniform tax requirement, whether or not the tax is broad-based, it must demonstrate compliance with paragraph (e)(2) of

APPENDIX II

this section.

(1) *Waiver of broad-based requirement only.* This test is applied on a per class basis to a tax that is imposed on all revenues but excludes certain providers. For example, a tax that is imposed on all revenues (including Medicare and Medicaid) but excludes teaching hospitals would have to meet this test. This test cannot be used when a State excludes any or all Medicaid revenue from its tax in addition to the exclusion of providers, since the test compares the proportion of Medicaid revenue being taxed under the proposed tax with the proportion of Medicaid revenue being taxed under a broad-based tax.

(i) A State seeking waiver of the broad-based tax requirement only must demonstrate that its proposed tax plan meets the requirement that its plan is generally redistributive by:

(A) Calculating the proportion of the tax revenue applicable to Medicaid if the tax were broad based and applied to all providers or activities within the class (called P1);

(B) Calculating the proportion of the tax revenue applicable to Medicaid under the tax program for which the State seeks a waiver (called P2); and

(C) Calculating the value of P1/P2.

(ii) If the State demonstrates to the Secretary's satisfaction that the value of P1/P2 is at least 1, CMS will automatically approve the waiver request.

(iii) If a tax is enacted and in effect prior to August 13, 1993, and the State demonstrates to the Secretary's satisfaction that the value of P1/P2 is at least 0.90, CMS will review the waiver request. Such a waiver will be approved only if the following two criteria are met:

(A) The value of P1/P2 is at least 0.90; and

(B) The tax excludes or provides credits or deductions only to one or more of the following providers of items and services within the class to be taxed:

*(1)* Providers that furnish no services within the class in the State;

*(2)* Providers that do not charge for services within the class;

*(3)* Rural hospitals (defined as any hospital located outside of an urban area as defined in § 412.62(f)(1)(ii) of this chapter);

*(4)* Sole community hospitals as defined in § 412.92(a) of this chapter;

*(5)* Physicians practicing primarily in medically underserved areas as defined in section 1302(7) of the Public Health Service Act;

*(6)* Financially distressed hospitals if:

*(i)* A financially distressed hospital is defined by the State law;

*(ii)* The State law specifies reasonable standards for determining financially distressed hospitals, and these standards are applied uniformly to all hospitals in the State; and

*(iii)* No more than 10 percent of nonpublic hospitals in the State are exempt from the tax;

*(7)* Psychiatric hospitals; or

*(8)* Hospitals owned and operated by HMOs.

(iv) If a tax is enacted and in effect after August 13, 1993, and the State demonstrates to the Secretary's satisfaction that the value of P1/P2 is at least 0.95, CMS will review the waiver request. Such a waiver request will be approved only if the following two criteria are met:

(A) The value of P1/P2 is at least 0.95; and

(B) The tax complies with the provisions of § 433.68(e)(1)(iii)(B).

(2) *Waiver of uniform tax requirement.* This test is applied on a per class basis to all taxes that are not uniform. This includes those taxes that are neither broad based (as specified in § 433.68(c)) nor uniform (as specified in § 433.68(d)).

(i) A State seeking waiver of the uniform tax requirement (whether or not the tax is broad based) must demonstrate that its proposed tax plan meets the requirement that its plan is generally redistributive by:

(A) Calculating, using ordinary least squares, the slope (designated as ( $B$ ) (that is, the value of the x coefficient) of two linear regressions, in which the dependent variable is each provider's percentage share of the total tax paid by all taxpayers during a 12-month period, and the independent variable is the taxpayer's "Medicaid Statistic". The term "Medicaid Statistic" means the number of the provider's taxable units applicable to the Medicaid program during a 12-month period. If, for example, the State imposed a tax based on provider charges, the amount of a provider's Medicaid charges paid during a 12-month period would be its "Medicaid Statistic". If the tax were based on provider inpatient days, the number of the provider's Medicaid days during a 12-month period would be its "Medicaid Statistic". For the purpose of this test, it is not relevant that a tax program exempts Medicaid from the tax.

(B) Calculating the slope (designated as B1) of the linear regression, as described in paragraph (e)(2)(i) of this section, for the State's tax program, if it were broad based and uniform.

(C) Calculating the slope (designated as B2) of the linear regression, as described in paragraph (e)(2)(i) of this section, for the State's tax program, as proposed.

**(II)** If the State demonstrates to the Secretary's satisfaction that the value of B1/B2 is at least 1, CMS will automatically approve the waiver request.

**(III)** If the State demonstrates to the Secretary's satisfaction that the value of B1/B2 is at least 0.95, CMS will review the waiver request. Such a waiver will be approved only if the following two criteria are met:

**(A)** The value of B1/B2 is at least 0.95; and

**(B)** The tax excludes or provides credits or deductions only to one or more of the following providers of items and services within the class to be taxes:

*(1)* Providers that furnish no services within the class in the State;

*(2)* Providers that do not charge for services within the class;

*(3)* Rural hospitals (defined as any hospital located outside of an urban area as defined in § 412.62(f)(1)(ii) of this chapter;

*(4)* Sole community hospitals as defined in § 412.92(a) of this chapter;

*(5)* Physicians practicing primarily in medically underserved areas as defined in section 1302(7) of the Public Health Service Act;

*(6)* Financially distressed hospitals if:

*(i)* A financially distressed hospital is defined by the State law;

*(ii)* The State law specifies reasonable standards for determining financially distressed hospitals, and these standards are applied uniformly to all hospitals in the State; and

*(III)* No more than 10 percent of nonpublic hospitals in the State are exempt from the tax;

*(7)* Psychiatric hospitals; or

*(8)* Providers or payers with tax rates that vary based exclusively on regions, but only if the regional variations are coterminous with preexisting political (and not special purpose) boundaries. Taxes within each regional boundary must meet the broad-based and uniformity requirements as specified in paragraphs (c) and (d) of this section.

**(iv)** A B1/B2 value of 0.70 will be applied to taxes that vary based exclusively on regional variations, and enacted and in effect prior to November 24, 1992, to permit such variations.

**(f)** *Hold harmless.* A taxpayer will be considered to be held harmless under a tax program if any of the following conditions applies:

**(1)** The State (or other unit of government) imposing the tax provides for a direct or indirect non-Medicaid payment to those providers or others paying the tax and the payment amount is positively correlated to either the tax amount or to the difference between the Medicaid payment and the tax amount. A positive correlation includes any positive relationship between these variables, even if not consistent over time.

**(2)** All or any portion of the Medicaid payment to the taxpayer varies based only on the tax amount, including where Medicaid payment is conditional on receipt of the tax amount.

**(3)** The State (or other unit of government) imposing the tax provides for any direct or indirect payment, offset, or waiver such that the provision of that payment, offset, or waiver directly or indirectly guarantees to hold taxpayers harmless for all or any portion of the tax amount.

**(i)**

**(A)** An indirect guarantee will be determined to exist under a two prong "guarantee" test. If the health care-related tax or taxes on each health care class are applied at a rate that produces revenues less than or equal to 6 percent of the revenues received by the taxpayer, the tax or taxes are permissible under this test. The phrase "revenues received by the taxpayer" refers to the net patient revenue attributable to the assessed permissible class of health care items or services. However, for the period of January 1, 2008 through September 30, 2011, the applicable percentage of net patient service revenue is 5.5 percent. Compliance in State fiscal year 2008 will be evaluated from January 1, 2008 through the last day of State fiscal year 2008. Beginning with State fiscal year 2009 the 5.5 percent tax collection will be measured on an annual State fiscal year basis.

**(B)** When the tax or taxes produce revenues in excess of the applicable percentage of the revenue received by the taxpayer, CMS will consider an indirect hold harmless provision to exist if 75 percent or more of the taxpayers in the class receive 75 percent or more of their total tax costs back in enhanced Medicaid payments or other State payments. The second prong of the indirect hold harmless test is applied in the aggregate to all health care taxes applied to each class. If this standard is violated, the amount of tax revenue to be offset from medical assistance expenditures is the total amount of the taxpayers' revenues received by the State.

**(II)** [Reserved]

[ 57 FR 55138, Nov. 24, 1992, as amended at 58 FR 43181, Aug. 13, 1993; 62 FR 53572, Oct. 15, 1997; 73 FR 9698, Feb. 22, 2008]

$$\left[\text{LII}\right]$$